**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| ACTION MANUFACTURING CO., INC., | : | |
| et al., | : | |
| Plaintiffs, | : | |
| v. | : | 02-CV-8964 |
| | : | |
| SIMON WRECKING CO., et al., | : | |
| Defendants. | : | |
| | : | |


**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**Brody, J.**                                                    **April 24, 2006**

**INTRODUCTION**

     This is a contribution action brought under the Comprehensive Environmental Response,

Compensation and Liability Act ("CERCLA") 42 U.S.C. § 9601 et seq. and its Pennsylvania law

counterpart, the Hazardous Sites Cleanup Act ("HSCA"), 35 Pa. Stat. Ann. § 6020.101 et seq.

The litigation arises from the contamination of the Malvern TCE Superfund Site in Malvern,

Pennsylvania (the "Site").   Chemclene Corporation ("Chemclene") processed and stored

industrial solvents and other waste at the Site from approximately 1952 to 1992.  By 1983, the

Site was on the federal Environmental Protection Agency's ("EPA") National Priorities List.

The EPA began considering the Site under the Superfund remedial program in 1993.  In 1996,

the EPA contacted all parties in the current suit to inform them that they were potentially

responsible parties ("PRPs") under § 107(a) of CERCLA.

     In 1999, plaintiffs, members of the Chemclene Site Defense Group ("CSDG"), entered a

consent decree with the EPA and the Pennsylvania Department of Environmental Protection

1

("DEP") in which the CSDG promised to undertake the remediation of the Site.  CERCLA

allows PRPs that settle their liability with the EPA and incur response costs to collect money

from other PRPs by bringing suit for contribution of amounts in excess of the plaintiff PRPs' fair

share of cleanup costs.  See CERCLA § 113, 42 U.S.C. § 9613.  In 2002, the CSDG brought this

contribution suit against seventy-four defendants.  Only Simon Wrecking, Simon Resources, and

Mid-State Trading (collectively, "the Simon Entities") remained active defendants by the time of

trial.  All other active parties have been dismissed or have settled with the plaintiffs.  What

remains before me is the contribution action between the CSDG and the Simon Entities.[1]

I held a bench trial of the action from January 4th through the 20th, 2006.  Now, after

considering the testimony and arguments at trial, the numerous exhibits of the parties, and their

extensive post-trial submissions, I find Simon Wrecking liable to the CSDG for contribution as a

transporter of hazardous waste to the Site under 42 U.S.C. § 9613(f) and § 9607(a).  I also find

Simon Resources, but not Mid-State trading, liable as a successor to Simon Wrecking under the

de facto merger exception as detailed in United States v. General Battery Corp., 423 F.3d 294,

305 (3d Cir. 2005).

After finding Simon Wrecking and Simon Resources liable, I determine the allocable

response costs incurred by the CSDG in remediating the Site.  First, the Simon Entities question

whether all expenses submitted by the CSDG were incurred pursuant to the National

Contingency Plan ("NCP"), as required by CERCLA § 107(a)(4)(B).  I find that they are

---

[1] After trial, the United States filed suit against Simon Wrecking, Inc. and Simon
Resources, Inc. seeking payment of response costs incurred by the United States at the Site under
Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and a declaratory judgment of liability under
Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2).  (United States of America v. Simon
Wrecking, Inc. and Simon Resources, Inc., Civil Action No. 06-CV-928, E.D. Pa.)

consistent with the NCP, with the exception of costs spent on identifying and investigating other PRPs.  Therefore I find that the CSDG has spent $4,224,701 in allocable past costs.  Next, both parties introduced estimates and expert testimony regarding the future costs that the CSDG will incur cleaning up the Site pursuant to the consent decree.  The consent decree requires the CSDG to implement the remedies that the EPA approved in its Record of Decision ("ROD") regarding the Site.  The relevant part of the Site consists of two areas, the main plant area ("MPA") and the former disposal area ("FDA").  The ROD specifies a different remedy for each area of the site.  The Simon Entities argue that I have the power to choose whether to base my cost estimates on the ROD-specified remedies, or on the cheaper bioremediation alternative it proposes to the expensive MPA groundwater remedy specified in the ROD.  I base my estimate of future costs on the ROD-mandated remedies, and find the CSDG's estimates most credible.  Therefore, I find that the CSDG's future allocable costs at the Site are $17,872,964.  Finally, I find that the CSDG is liable to the EPA for an estimated $1,000,000 in oversight costs, which are also allocable in this contribution suit.  The total response costs at the Site to be allocated in this suit are the sum of these three amounts: $4,224,701 + $17,872,964 + $1,000,000 = **$23,097,665**.

After finding Simon Wrecking liable and ascertaining the total response costs, I allocate those costs among the PRPs.  CERCLA empowers the trial court to allocate response costs using such "equitable factors as it deems appropriate."  42 U.S.C. § 9613(f)(1).  The parties devoted much of the trial and their briefs to arguing how costs should be allocated among the parties should the Simon Entities be found liable.  After considering the evidence and arguments presented to me, I account for the shares of settled PRPs using the pro tanto approach, subtracting the amounts of earlier settlements from the total costs to be allocated between the

3

CSDG and the Simon Entities.  The amount the CSDG will receive from its settlement with Chemclene is still unknown, so I use the variable X to denote it.[2]  The total amount of settlements the CSDG has received is **($6,630,670 + X)**, and therefore the remaining costs to be allocated are  $23,097,665 - ($6,630,670 + X) = **($16,466,995 - X)**.  I decide to allocate the orphan share proportionally between the CSDG and the Simon Entities based on their relative shares of waste.

I determine the relative shares of the CSDG and the Simon Entities based on the documented deliveries of waste and then discount Simon's share by 10% to account for uncertainty over whether Simon Wrecking always had substantial input in choosing the Site. This analysis yields relative shares of 93.75% for the CSDG and **6.25%** for Simon Wrecking.  I reject the CSDG's arguments for a recalcitrance penalty, but do apply an uncertainty premium of 50% to Simon's share, which raises it to 9.38%.  Therefore Simon Wrecking's share of the total response costs incurred by the CSDG is **9.38% x ($16,466,995 - X)**.  I do not award prejudgment interest.  I enter an interlocutory order finding Simon Wrecking and Simon Resources jointly and severally liable to the CSDG using this formula, and schedule a hearing on the value of X.  After hearing, I will issue a final order for a sum certain according to the formula.

In accordance with Federal Rule of Civil Procedure 52(a), I now make and enter the following Findings of Fact and Conclusions of Law, beginning with the parties' stipulations narrowing the scope of trial.

---

[2] I will hold a hearing on the value of X, the amount the CSDG will receive from its settlement with Chemclene, on May 5, 2006.

**TRIAL STIPULATIONS**

I accept the following stipulations of the parties submitted January 11, 2006[3]:

1.    The Site, located in East Whiteland Township, Pennsylvania, is a "facility" as that term is

defined in 42 U.S.C. § 9601(9).

2.    The Site is a "site" as defined in section 103 of the HSCA, 35 P.S. § 6020.103.

3.    "Hazardous substances" as defined in section 101(14) of CERCLA, 42 U.S.C. §

9601(14), were disposed of, placed on or otherwise became located at the Site.

4.    There have been "releases," as that term is defined in section 101(22) of CERCLA, 42

U.S.C. § 9601(22), or threatened releases of hazardous substances into the environment at

or from the Site.

5.    There have been "releases" or "substantial threats of releases" of "hazardous substances"

and "contaminants" into the environment at or from the Stie, as those terms are defined in

sections 101(22), 103 and 501(a) of HSCA, 35 P.S. §§ 6020.101(22), 6020.103 and

6020.501(a).

6.    The release or releases have caused the incurrence of "response" costs at the Site, as that

term is defined in 42 U.S.C. § 9601(25).

7.    The definition of "person" under 42 USC § 9601 and 35 P.S. § 6020.103 includes a

corporation.

8.    Simon Wrecking Co., Inc., Simon Resources, Inc., and Mid-State Trading Co., Inc. are all

corporations.

---

[3] I have somewhat condensed the stipulations from the form in which they were
presented.

9.      Simon Wrecking Co., Inc., Simon Resources, Inc., and Mid-State Trading Co., Inc. are all

        persons as that term is defined under both 42 U.S.C. § 9601 and 35 P.S. § 6020.103.


**FINDINGS OF FACT**[4]

The Chemclene Site and Its Operations

1.      The Malvern TCE Superfund Site (the Site) is located in East Whiteland Township,

        Pennsylvania at 258 North Phoenixville Pike in Malvern.  (Pls.' Dietz Ex.1 at ES 1-2; Tr.

        1/10/06 at 139 (L. Balderston).)

2.      From at least 1974 through August 1993, Chemclene was the owner/operator of the Site,

        where it received and distilled waste solvents to recover clean solvents.  (Pls.' Dietz Ex.

        1, pat ES 1-2; Tr. 1/9/06 at 5 (J. Lupo).)

3.      During at least the period 1974 to 1980, the waste solvent was usually brought to

        Chemclene in 55 gallon metal containers, sometimes referred to as "drums" or "barrels."

        (Tr. 1/9/06 at 6 (J. Lupo).)

4.      The distillation process took place at the Site.  (Tr. 1/9/06 pat 9-10 (J. Lupo).)

5.      After distillation, the recovered solvent was drummed or put in tanks for bulk delivery

        and then delivered off-site to Chemclene customers.  (Tr. 1/9/06 at 10 (J. Lupo).)

6.      Some of the drums of waste solvent that Chemclene accepted contained waste

        trichloroethylene, sometimes referred to as "TCE," "trico" or "tri" by Chemclene

        personnel.  (Tr. 1/9/06 at 6-7 (J. Lupo); Tr. 1/10/06 at 18-19 (G. Dippell); Tr. 1/10/06 at

        119-120 (L. Balderston).)

---

        [4] For a complete list of witnesses who testified at trial and their relationship to the
litigation, see Appendix A.

7.      Some of the drums of waste solvent Chemclene accepted contained waste 1,1,1

trichloroethane, sometimes referred to as "TCA" or "1,1,1" by Chemclene personnel.

(Tr. 1/9/06 at 7 (J. Lupo); Tr. 1/10/06 at 19 (G. Dippell); Tr. 1/10/06 at 20 (L.

Balderston).)

8.      Some of the drums of waste solvent Chemclene accepted contained waste methylene

chloride, sometimes referred to as "M/C" by Chemclene personnel.  (Tr. 1/9/06 at 7 (J.

Lupo); Tr. 1/10/06 at 19-20 (G. Dippell); Tr. 1/10/06 at 120 (L. Balderston).)

9.      During the period of 1974-1980, it was the practice of Chemclene personnel to sign or

initial a delivery document presented by the truck driver, typically on the letterhead of the

delivering company, for the delivery of waste solvent.  (Tr. 1/9/06 at 11-13 (J. Lupo).)

10.     It was also the usual practice of Chemclene personnel to prepare a receiving record that

recorded the receipt of waste solvent drums that were dropped off.  (Tr. 1/9/06 at 11-12

(J. Lupo).)

11.     From time to time, Chemclene personnel made a record of the amount of solvent

reclaimed from a customer's waste solvent after distillation at Chemclene.  (Tr. 1/10/06 at

24 (G. Dippell).)

12.     Chemclene personnel referred to the record of the amount of reclaimed solvent produced

from a customer's waste solvent by the still at Chemclene as "internal paperwork."  (Tr.

1/10/06 at 24-25 (G. Dippell).)

13.     Chemclene employee King Graver began working for Chemclene in the middle of 1975.

(Tr. 1/10/06 at 94 (K. Graver).)

14.     After Henry Lloyd Balderston died in December 1975, King Graver ("Graver") was

responsible for filing and maintaining Chemclene's records until his son, Lloyd

Balderston ("Balderston"), came into the business approximately six months later.  (Tr.

1/10/06 at 96 (K. Graver), at 109-10 (L. Balderston).)

15.    From 1976 through 1978, Graver or Balderston did the filing of Chemclene's documents,

which were kept at the Chemclene plant or office.  (Tr. 1/10/06 at 95-97, 103-04 (K.

Graver).)

16.    In the 1990s, in response to a written request from the EPA, Balderston produced a large

number of documents to the EPA.  (Tr. 1/10/06 at 111 (L. Balderston).)

17.    The documents produced to the EPA in the 1990s consisted of Chemclene's business

records, which it was Chemclene's practice to maintain in the office at Chemclene's

premises until they were produced to the EPA.  (Tr. 1/10/06 at 115 (L. Balderston).)

18.    Ray Dovell, the CSDG's allocation expert, and Mark Stevens, the CSDG's liaison

counsel, reviewed Chemclene's original business records at the EPA's offices in 1998

and arranged through EPA to get the records copied and bates-stamped at an offsite

vendor.  The copies were then sent back to Dovell's office.  (Tr. 1/13/06 at 22-23 (R.

Dovell).)

19.    In the 2000s, in response to a subpoena served on him in this case, Balderston delivered

another large number of documents to his attorney, Paul Boni.  (Tr. 1/10/06 at 116 (L.

Balderston).)

20.    The documents delivered to Paul Boni in the 2000s consisted of Chemclene's business

records, that, until produced, were maintained in its office at the Chemclene premises.

(Tr. 1/10/06 at 116 (L. Balderston).)

Simon Wrecking's Involvement with the Site

21.     On May 21, 1973, the Pennsylvania Public Utility Commission granted Simon Wrecking

authority to operate as a common carrier of spent oil and solvents.  (Defs.' Simon Ex. 1;

Tr. 1/19/06 at 32-33 (D. Simon).)

22.     Simon Wrecking brought drums of waste solvent to Chemclene for reclamation during

the period of 1974 to 1980.  (Tr. 1/4/06 at 116, 119-124 (Simon Entities Rule 30(b)(6)

Dep).)

23.     Some of the materials that Simon Wrecking transported to Chemclene are reflected on

Simon Wrecking receipts and other documents produced by the Simon Entities in

response to Plaintiffs' Request for Production.  (Defs.' Resp. #4B to Pls.' First Interrogs.,

at 3 of Tab C in Simon Entities' Rule 30(b)(6) deposition binder.)

24.     The materials that Simon Wrecking transported to Chemclene included trichloroethylene

(TCE), 1-1-1 trichloroethane (TCA) and methylene chloride, as well as unspecified waste

solvent.  (Simon Entities' Rule 30(b)(6) Dep. Ex. 19; Pls.' Mullin Ex. 3.)

25.     Chemclene personnel do not recall or did not know the identity of the originator of the

waste solvent dropped off at Chemclene by Simon Wrecking.  (Tr. 1/9/06 at 14 (J.

Lupo).)

26.     In contrast, Chemclene personnel were aware of the identity of the originators of waste

solvent dropped off at Chemclene by other transporting firms, namely, RTS, Eldredge

and Keystone Block.  (Tr. 1/9/06 at 14-15 (J. Lupo).)

27.     Chemclene had a different relationship with Simon Wrecking than with these other

9

transporting firms, which only brought waste to Chemclene at the direction of the generators of the waste.  (Tr. 1/9/06 (J. Lupo).)

28.   Letterkenny Army Depot ("Letterkenny") was a customer of Simon Wrecking.  (Tr. 1/4/06 at 123 (Simon Entities); Pls.' Stevens Ex. 22.)

29.   As far as the Chemclene employees can recall today, Letterkenny was not a customer of Chemclene.  (Tr. 1/9/06 at 29 (J. Lupo); 1/10/06 at 54 (G. Dippell); at 104 (K. Graver); at 136-37 (L. Balderston).)

30.   Supelco Company ("Supelco") was a customer of Simon Wrecking.  (Tr. 1/4/06 at 121 (Simon Entities); Simon Entities Rule 30(b)(6) Dep. at 81-82, Ex. 18 at2.)

31.   As far as the Chemclene employees can recall today, Supelco was not a customer of Chemclene.  (Tr. 1/9/06 at 30 (J. Lupo); 1/10/06 at 54 (G. Dippell); at 104 (K. Graver); at 137 (L. Balderston).)

32.   Adrian Reeder worked as a contracting officer for the federal government at Letterkenny in Chambersburg, Pennsylvania for over 20 years, until 1982 or 1983.  (Tr. 1/17/06 at 6 (A. Reeder).)

33.   Reeder was in charge of supervising the soliciting of proposals from contractors for the purchase of goods and services throughout Letterkenny. After getting a proposal, Reeder would execute a contract, usually based on the low bid.  (Tr. 1/17/06 at 7 (A. Reeder).)

34.   On some days Reeder signed over 100 purchase orders.  (Tr. 1/17/06 at 14 (A. Reeder).)

35.   On November 18, 1975, Reeder signed a purchase order for the removal of various 55 gallon drums of waste from Letterkenny.  (Tr. 1/17/06 at 8 (A. Reeder); Pls.' Reeder Ex. 1.)

36.   Reeder did not tell Simon Wrecking where to take the waste that was the subject of the November 18, 1975 purchase order.  (Tr. 1/17/06 at 11 (A. Reeder).)

37.   During the time that Reeder worked at Letterkenny, it was the policy of Letterkenny not to tell a transporter where to take waste, unless that information was in the contract between Letterkenny and the transporter.  (Tr. 1/17/06 at 9-10 (A. Reeder).)

38.   Defendants' Reeder Exhibit 2 is a Straight Bill of Lading from Letterkenny dated September 23, 1976, which consigned materials carried by Simon Wrecking to Chemclene in Malvern, PA.  It is signed by Hugh A. Weisman for E.F. Witt, whom Reeder identified as Chief of the Depot Facilities Division at Letterkenney.  (Tr. 1/17/06 at 19-20 (A. Reeder); Defs.' Reeder Ex. 2.)

39.   The second page of the November 18, 1975 purchase order signed by Reeder contains a paragraph requiring a "certificate from the contractor that the materials collected will be disposed of or reprocessed for reuse in accordance with all state and federal environmental protection agency laws and regulations."  (Pls.' Reeder Ex. 1 at 2.)

40.   Balderston wrote Sam Simon, president of Simon Wrecking, a letter on Chemclene letterhead dated December 1, 1978, stating:

> With reference to your government contract no. DAAG34-79-1015, this is to certify that the used "trico" or trichlorethylene received from you will be reprocessed for reuse in accordance with all applicable local, state and federal regulations.

(Pls.' Balderston Ex. 5.)  This is the form of certificate required by the November 19, 1975 purchase order, and it references a government contract purchase number from Letterkenny.  (Tr. 1/17/06 at 24 (A. Reeder).)

11

41.     The documented waste deliveries that Simon Wrecking made to Chemclene, all during

the period of 1974 to 1978, are summarized in the following chart[5]:

|   | Amount, Description & Date | Supporting Documents | Defendants' Objections, if any | Amt. Counted |
|---|---|---|---|---|
| a | 65 drums "dirty Trico" dated 10/3/74. | Pls.' Dippell Ex. 1, a Simon Wrecking delivery document signed by George Dippell ("Dippell"), a Chemclene employee. | | 65 |
| b | 70 drums "dirty solvent from Simon Wrecking" dated 10/9/74. | Pls.' Lupo Ex. 1, a Simon Wrecking delivery document signed by Jeffrey Lupo ("Lupo"), a Chemclene employee. | The unspecified dirty solvent is not proven to be hazardous. | 70 |
| c | 61 drums "Trichloretylene" [sic] dated 10/29/74. | Pls.' Dippell Ex. 2, a Simon Wrecking delivery document signed by Dippell. | | 61 |

---

[5] Where plaintiffs' expert Dovell did not count a transaction toward Simon Wrecking's volumetric ranking, I did not count it either, because he used his expertise in choosing which records were too unreliable or duplicative of others to be counted. Also, I counted only half of the drums that Simon Wrecking transported from Letterkenny Army Depot toward Simon Wrecking's total, because Letterkenny was the one ascertainable generator of waste hauled by Simon Wrecking, and the CSDG has settled with Letterkenny. Finally, I did not count the volume from any production run documents (internal paperwork), because I have insufficient reason to believe those volumes were not accounted for in receiving or delivery records, and because Dovell himself discounted those volumes in all but one case. For more discussion of my calculation of volumetric shares, see discussion infra at 66.

| d | 47 drums of "Tri" and 40 drums of "1-1-1" run on or before 10/31/74. | Pls.' Dippell Ex. 3, A sheet titled "Simon Results"; Tr. 1/10/06 at 28-31 (G. Dippell). [These drums were not counted toward Simon's drum count by plaintiffs' expert allocation witness, Raymond Dovell, in his analysis. Pls.' Dovell Ex. 8 at 65.] | At his deposition, Dippell did not recognize the handwriting on the exhibit, and said that he did not keep a record of the amount of solvent placed in a still and then reclaimed.  At trial he confirmed that his deposition answer was correct.  Tr. 1/10/06 at 60 (G. Dippell). | 0 [internal production run document; not counted by Dovell.] |
| e | 75 drums "used solvent from Simon Trucking" dated 11/14/74. | Pls.' Lupo Ex. 2, a Simon Wrecking delivery document signed by Lupo. | The unspecified used solvent is not proven to be hazardous. | 75 |
| f | 60 drums "used solvent from Simon" dated 11/15/74. | Pls.' Lupo Ex. 3, a Simon Wrecking delivery document signed by Lupo. | The unspecified used solvent is not proven to be hazardous. | 60 |
| g | 78 drums of "sludge and waste" dated 11/22/74. | Pls.' Dippell Ex. 4, a Simon Wrecking delivery document signed by Dippell. | These materials were not proven to be hazardous. | 78 |
| h | "T/L Liquid Waste in Drums" consisting of 62 drums, 9 20-gallon drums, 6 5-gallon cans, and 10 1-quart cans of "light gunk" dated 1/2/75. | Pls.' Dippell Ex. 5, a Simon Wrecking Delivery Document signed by Dippell; Pls.' Dippell Ex. 6, a Chemclene receiving record detailing the contents of the truckload, initialed by a Simon Wrecking delivery document initialed by Dippell. | The "light gunk" is not proven to be hazardous. Dippell testified that he has no idea how many drums were in this delivery, and has no idea what he meant by "light gunk(?)." Tr. 1/10/06 at 36.  At his deposition Dippell did not recognize Exhibit 6 and did not recall a company called Simon being a customer of Chemclene. Tr. 1/10/06 at 63-67. | 67.51 |

| i | Additional 65 drums "dirty tri from Simon Wrecking" with no date specified. | Pls.' Lupo Ex. 6, a Preston Trucking Company shipping order signed by Lupo. | Lupo does not recall filling out the form. Tr. 1/10/06 at 40-41 (J. Lupo). | 65 |
|---|---|---|---|---|
| j | 74 drums "degreasing solvent" dated 1/24/75. | Pls.' Lupo Ex. 4, 5, copies of a Simon Wrecking delivery document signed by Lupo. | Unspecified degreasing solvent not proven to be hazardous. Not counted by Dovell in his analysis. | 0<br><br>[not counted by Dovell.] |
| k | 74 drums "solvent?" dated 1/27/75. | Pls.' Dippell Ex. 7 is a receiving record created by Dippell, and Pls.' Dippell Ex. 8 is a carbon copy of the same document with amounts of reclaimed solvent written on it. Tr. 1/10/06 at 40-41 (G. Dippell). | Dippell testified that he doesn't know why he wrote "chloroform" on Ex. 8. Tr. 1/10/06 at 72 (G. Dippell). At his deposition, he had "no idea" who Simon was. Id. | 74 |
| l | 78 drums "degreasing solvent" dated 1/27/75 (described as "questionable" in receiving record dated 1/29/75). | Pls.' Dippell Ex. 9, a Simon Wrecking delivery document signed by Dippell, and Pls.' Dippell Ex. 10, a receiving record for the same drums created by Dippell. Tr. 1/10/06 at 41-43. | This unspecified degreasing solvent was not proven to be hazardous. Also, Dippell testified he only recognized his signature on the document. Tr. 1/10/06 at 42. | 78 |

14

| m | 43 drums and 6 cans "solvent to be run" (also described as "Trico") that produced 120 gallons of "Tri" and 400 gallons of "1-1-1," dated 12/16/75. | Pls.' Graver Ex. 1, a Simon Wrecking delivery document signed by King Graver ("Graver"), a Chemclene Employee, and Pls.' Dippell Exs. 11, 12, copies of a receiving record prepared by Dippell for the same barrels, Ex. 11 recording how much solvent Chemclene reclaimed. | Graver only recognized his signature on Pl.'s Graver Ex. 1 and did not know what the words on the form meant.  Tr. 1/10/06 at 99-100, 102, 108 (K. Graver). These drums are from Letterkenny Army Depot. See Pls.' Reeder Ex. 1; Simon 30(b)(6) Deps. Ex. 19, at SW-002453. | 21.5<br><br>[half is counted toward Simon's total because the drums are from Letterkenny.] |
|---|---|---|---|---|
| n | 160 drums of "Trico" dated 9/24/76. | Pls.' Balderston Ex. 3, a Simon Wrecking delivery document signed for by Lloyd Balderston ("Balderston"), Chemclene company president. | Defs.' Reeder Ex. 2 is a bill of lading from Letterkenny Army Depot consigning 80 drums to "Chemcleen" [sic], and Simon Wrecking receiving records showing pick-up of the 80 drums on 9/23/76 and 80 drums on 9/24/76. | 80<br><br>[1/2 is counted b/c from L'kenny.] |
| o | 75 drums of "Trico" dated 9/27/76. | Pls.' Balderston Ex. 4, a Simon Wrecking delivery document signed for by Balderston. | Balderston only recognized his signature on the document.  Tr. 1/10/06 at 145 (L. Balderston). | 75 |
| p | 53 drums of "Trico" dated 9/28/76. | Pls.' Dippell Ex. 14, a Simon Wrecking delivery document signed by Dippell. | The Simon Entities assert that these were Letterkenny drums and should not have been attributed to Simon. | 26.5<br><br>[1/2 is counted b/c from L'kenny.] |

| q | 89 drums "solvent," 5 drums "oil" and 5 drums "solid" dated September 1976. | Pls.' Dippell Ex. 13, internal paperwork showing how much material Chemclene reclaimed from these materials, recorded by Dippell. | These materials were not proven to be hazardous. Also, Dovell did not count these amounts toward Simon's volumetric ranking. Pls.' Dovell Ex. 8 at 65. | 0<br><br>[not counted by Dovell; internal production run.] |
|---|---|---|---|---|
| r | 47 drums "solvent," 6 drums "oil," and 23 drums "solids" in "Feb - March 1977." | Pls.' Dippell Ex. 13, internal paperwork in which Dippell recorded how much Chemclene reclaimed from these materials. | These materials were not proven to be hazardous, and production run information should not be counted. | 0<br><br>[internal production run.] |
| s | 46 drums of material including 25 drums "run-able solvent" "run from 3/15/77 to 3/18/77." | Pls.' Dippell Ex. 15, internal paperwork in which Dippell recorded how much solvent Chemclene reclaimed from the waste. | These materials were not proven to be hazardous. Dovell did not count these amounts toward Simon's volumetric ranking. Pls.' Dovell Ex. 8 at 65. | 0<br><br>[not counted by Dovell; internal production run.] |
| t | 80 drums "waste 'trico'" dated 12/20/78. | Pls.' Balderston Ex. 6, a Chemclene receiving record signed by Balderston; Simon Entities Rule 30(b)(6) Dep. Ex. 19, a Straight Bill of Lading from Letterkenny Depot consigning the drums to Simon. | Balderston was not sure he prepared the ticket. Tr. 1/10/06 at 45 (L. Balderston).<br><br>Because these are Letterkenny drums, they should not be counted toward Simon's total. | 40<br><br>[1/2 is counted b/c from L'kenny.] |

| u | 80 drums "waste 'trico'" dated 12/21/78. | Pls.' Dippell Ex. 16, a Chemclene receiving record signed by Dippell, and Pls.' Dippell Ex. 17, a Chemclene receiving record for the 160 drums delivered over 12/20-12/21/78. Also, Simon Entities Rule 30(b)(6) deposition Ex. 19 is a straight bill of lading for the 80 drums, consigning them to Simon. | Dippell testified he did not know why he crossed out one name in the "Received From" box and put in another.  Tr. 1/10/06 at 53 (G. Dippell).  He also testified that he didn't know who Sam Simon was or what the term "via them or theirs" meant.  Id. at 91. Because these drums were from Letterkenny, they should not count toward Simon's total. Dovell counted 50% toward Simon's volumetric ranking.  Pls.' Dovell Ex. 8 at 66. | 40 [1/2 is counted b/c from L'kenny.] |
|---|---|---|---|---|
| | **Total number of drums of waste related to Simon Wrecking** | Dovell counts 1,136 drums towards Simon's total.  Pls.' Dovell Ex. 2. | The Simon Entities' expert Wittenbrink counts 701 drums towards Simon's total.  Defs.' Wittenbrink Ex. 3-4. | **976.5** |
| | **Simon Wrecking's total drums of waste reduced by 10% to account for differing input on site selection** | | | **878.86** |

42.    Simon Wrecking's adjusted drum count is 878.86.

43.    The CSDG's adjusted drum count is 13,190.51.  (Pls.' Dovell Ex. 2, 8.)

44.    The sum of the CSDG's and Simon Wrecking's adjusted drum counts is 14,069.37 drums of waste.  The CSDG's share accounts for 93.75 % of that amount, and Simon

17

Wrecking's share accounts for 6.25 %.

<u>Remediation of the Site</u>

45.     The EPA listed the Site on the National Priorities List in 1983.  (Tr. 1/5/06 at 7 (L. Dietz).)

46.     The EPA Office of Superfund Programs took over remediation of the Site from the Pennsylvania DEP in November 1993, under CERCLA.  (Pls.' Dietz Ex. 1 at ES- 2-3.)

47.     A contractor for the EPA conducted a "remedial investigation" of soil, ground water and surface water at the Site to determine the extent of contamination, and prepared a "remedial investigation report" dated January 1997.  (Tr. 1/5/06 at 7-8 (L. Dietz).)

48.     Part of the Site is known as the "former disposal area" ("FDA"), and another part of the Site is known as the "main plant area" ("MPA").  (Tr. 1/5/06 at 8 (L. Dietz).)

49.     Chemclene distilled waste solvents at the MPA.  (Tr. 1/5/06 at 10-11 (L. Dietz); Tr. 1/9/06 at 9-10 (J. Lupo).)

50.     The remedial investigation revealed that hazardous substances, including trichloroethylene ("TCE") and 1,1,1 trichloroethane ("TCA"), were present at the MPA portion of the Site, in both the soil and the groundwater.  (Tr. 1/5/06 at 12-14 (L. Dietz); Tr. 1/11/06 at 28 (C. Young).)

51.     The remedial investigation revealed that hazardous substances, including TCE and TCA, were present at the FDA portion of the Site, in both the soil and the groundwater.  (Tr. 1/5/06 at 12-14 (L. Dietz).)

52.     In November 1997, the EPA issued its Superfund Program Record of Decision ("1997

18

ROD") evaluating and selecting remedial actions for the Site.  (Pls.' Dietz Ex. 3.)

53.    The 1997 ROD lists "Chemicals of Potential Concern for Human Health Evaluation" at

the Site, including TCE and TCA.  (Tr. 1/5/06 at 16-17 (L. Dietz); Pls.' Dietz Ex. 3,

Table 7.)

54.    The 1997 ROD had five selected remedy components.  (Tr. 1/5/06 at 17-18 (L. Dietz);

Pls.' Dietz Ex. 3 at 52-64.)

55.    The first component of the 1997 ROD remedy was to provide an alternative water supply

to address contaminated ground water at the Hillbrook Circle area, a residential

development, as well as for some other homes adjacent to the Site.  (Tr. 1/5/06 at 18-19

(L. Dietz); Pls.' Dietz Ex. 3 at 54-56.)

56.    The second component was an engineered "cap" for the MPA soils, designed to reduce

the infiltration of any surface water such as rain and snow to the ground water. (Tr. 1/5/06

at 20 (L. Dietz); Pls.' Dietz Ex. 3 at 54-56.)

57.    The third component of the 1997 ROD was a system for ground water collection,

treatment and discharge, commonly known as "pump and treat," of the MPA ground

water.  Monitoring wells are also a component of this remedy.  (Tr. 1/5/06 at 20-21; Pls.'

Ex. Dietz 3 at 56-60.)

58.    The "pumping" part of "pump and treat" includes pumping and extraction of groundwater

from the subsurface.  The "treating" part includes allowing the contaminated water to

trickle down a tower known as an air stripper, in which the contaminants are released as a

vapor.  The contaminants in vapor form are absorbed by carbon in large carbon vessels,

which must be replaced or regenerated because the carbon can absorb only a limited

amount of contaminants.  After being stripped of contaminants, the water is then re-injected into the groundwater, so there is no loss of groundwater to the system.  (Tr. 1/11/06 at 21-25 (C. Young).)

59.    The "remedy drivers," i.e., the predominant contaminants of the MPA groundwater, are TCE and TCA.  (Tr. 1/11/06 at 28-29 (C. Young).)

60.    The fourth component of the 1997 ROD was excavation of contaminated soil at the FDA and off-site treatment and disposal of the soil, also known as "soil removal."  (Tr. 1/5/06 at 21 (L. Dietz); Pls.' Dietz Ex. 3 at 60-61.)

61.    The fifth component of the 1997 ROD was monitored natural attenuation ("MNA") for the contaminated groundwater at the FDA, which means monitoring the groundwater as it continues to purify itself.  (Tr. 1/5/06 at 21 (L. Dietz); Pls.' Dietz Ex. 3 at 62-63.)

62.    On June 17, 1999, the CSDG signed a consent decree (the "Consent Decree") with the EPA, requiring it to perform the remedy selected by the EPA and set forth in the ROD. By signing the Consent Decree, the CSDG agreed to do the work necessary to hire the contractors and consultants, and to oversee and manage the cleanup of the Site.  (Tr. 1/4/06 at 154-57 (S. Zelov); Pls.' Zelov Ex. 1; Tr. 1/5/06 at 22 (L. Dietz).)

63.    At the time the Consent Decree was signed, the members of the CSDG were the 24 "Settling Performing Defendants" listed on Appendix B-1 to the Consent Decree.  NW Controls is no longer a member of the CSDG, while Tyco Corporation has joined the CSDG since the signing of the Consent Decree.  (Tr. 1/4/06 at 159-161; Pls.' Zelov Ex. 2.)

64.    The CSDG hired de maximis, inc. to be the "supervising contractor" as required by the

20

Consent Decree. Chris Young ("Young") of de maximis, inc. is the project coordinator for the CSDG. (Tr. 1/4/06 at 166-67 (S. Zelov); Tr. 1/11/06 at 8 (C. Young); Pls.' Zelov Ex. 1 at 19.)

65.   De maximis inc.'s work at the Site requires it to interact with the EPA's remedial project manager.  The EPA's remedial project managers for the Site since the Consent Decree was signed have been Linda Dietz ("Dietz"), James Harper and Charlie Root.  (Tr. 1/11/06 at 12 (C. Young).)

66.   The CSDG performed the water connections required by the ROD in the Hillbrook Circle neighborhood to the satisfaction of the EPA.  (Tr. 1/4/06 at 169 (S. Zelov); Tr. 1/5/06 at 28-29 (L. Dietz).

67.   The CSDG, through its contractor, Golder Associates ("Golder"), performed a Pre-Design Investigation ("PDI") at the Site and submitted the PDI report to EPA.  The PDI revealed that the contamination at the FDA was more extensive than was found at the time of the Remedial Investigation.  (Tr. 1/4/06 at 168, 170 (S. Zelov); Tr. 1/5/06 at 24-25 (L. Dietz); Tr. 1/11/06 at 9, 131 (C. Young); Pls.' Dietz Ex. 4.)

68.   The PDI Report was approved by the EPA.  (Tr. 1/11/06 at 123 (C. Young); Pls.' Dietz Ex. 4.)

69.   Because of the new information about contamination levels found during the PDI, the CSDG commissioned its contractor Golder to perform a Focused Feasibility Study of alternatives other than soil excavation at the FDA.  (Tr. 1/5/06 at 25-26 (L. Dietz); Pls.' Dietz Ex. 5.)

70.   Golder performed a pilot test of Soil Vapor Extraction ("SVE") of the FDA soils as part

of the Focused Feasibility Study.  SVE is an <u>in situ</u> remedy in which wells in the soil

extract vapors coming off the contaminants subsurface, instead of excavating the soils.

(Tr. 1/5/06 at 26-27 (L. Dietz); Tr. 1/11/06 at 9 (C. Young).)

71.     Following the CSDG's pilot test of SVE for the FDA soils remedy, the CSDG petitioned

the EPA for an amendment to the ROD with respect to that remedy.  (Tr. 1/5/06 at 26-28

(L. Dietz).)

72.     In September 2004, the EPA proposed an amendment to the 1997 ROD to change the

EPA's selected remedy for the FDA soils from excavation to an in-situ SVE system.  The

proposed amendment was approved by the EPA in March 2005.  (Tr. 1/5/06 at 27-28 (L.

Dietz); Pls.' Dietz Ex. 6 at 3.)

73.     The CSDG hired O'Brien & Gere as its contractor to construct the remedy.  (Tr. 1/4/06 at

171 (S. Zelov); Tr. 1/11/06 at 9 (C. Young).)

74.     The CSDG is performing the FDA soils remedy required by the amended ROD, SVE, to

the satisfaction of the EPA.  Remedial design of the SVE is complete, and construction of

the remedy is nearly completed.  Long-term operation and maintenance of the FDA soils

component is yet to be performed.  (Tr. 1/5/06 at 29 (L. Dietz).)

75.     The CSDG is performing the FDA groundwater remedy required by the ROD, MNA, to

the satisfaction of EPA.  Remedial design for the FDA groundwater component of the

remedy is complete and the monitoring wells for this component are in place.  Long-term

operation and maintenance of the FDA groundwater component of the remedy has yet to

be performed.  (Tr. 1/5/06 at 29 (L. Dietz).)

76.     The CSDG is performing the MPA soils remedy required by the ROD, capping, to the

satisfaction of the EPA.  Remedial design for the MPA soils component of the remedy is

complete, and construction of this component is nearly complete.  Long-term operation

and maintenance of the component has yet to be performed.  (Tr. 1/5/06 at 29-32 (L.

Dietz).)

77.     In the summer of 2005, drums were found at the MPA that were so old, corroded, and

deteriorated that the EPA could not determine their age.  In response, the CSDG extended

the area of the cap at the MPA to cover the area where the drums were found.  (Tr. 1/5/06

at 31 (L. Dietz).)

78.     The MPA groundwater component of the remedy, "pump and treat," has not been

designed yet.  (Tr. 1/5/06 at 32 (L. Dietz).)

79.     The EPA has consented to all the work performed at the Site and has never objected to

any of the work performed at the Site by the CSDG.  (Tr. 1/5/06 at 22, 28-29 (L. Dietz);

Tr. 1/11/06 at 132 (C. Young).)

80.     Bioremediation is not part of the remedy selected for the MPA groundwater.  (Tr. 1/5/06

at 33 (L. Dietz).)

81.     On behalf of the CSDG, Young asked the EPA to consider bioremediation as a viable

alternative to "pump and treat" to clean up the MPA groundwater.  Under Young's

direction, Golder Associates conducted a pilot study of bioremediation at the site, and

submitted a bioremediation pilot test report to James Harper of the EPA in February

2005.  (Tr. 1/11/06 at 31-35 (C. Young); Pls.' Young Ex. 1.)

82.     In a letter dated August 22, 2005, Linda Dietz of the EPA told Young that bioremediation

could not replace "pump and treat" as the remedy for the MPA groundwater. (Tr. 1/5/06

at 35 (L. Dietz); 1/11/06 at 49 (C. Young); Pls.' Dietz Ex. 7.)

83.    The CSDG, through O'Brien & Gere, commissioned a microcosm study of an alternative

bioremediation treatment, which has not been pilot tested yet.  (Tr. 1/11/06 at 66-70 (C.

Young).)

84.    Young wrote to Dietz in October 2005 about further exploration of bioremediation at the

site, but the CSDG has not petitioned the EPA to use bioremediation as an enhancement

to the "pump and treat" remedy for the MPA groundwater.  The EPA has made no

decision on whether it might adopt bioremediation as an enhancement to the "pump and

treat" remedy.  (Tr. 1/5/06 at 35-40 (L. Dietz); Pls.' Dietz Ex. 7, 8.)

85.    The EPA prepared a five-year review of the Site dated September 2005.  As part of the

five-year review, the EPA has asked the CSDG to perform a vapor intrusion study at the

Site, and to do an analysis to see if 1,4 dioxane is detected in the ground water at the Site.

The CSDG is complying with those requests.  (Tr. 1/5/06 at 41-45 (L. Dietz); Pls.' Deitz

Ex. 9, 10.)

86.    Any work the CSDG does regarding potential vapor intrusion or 1,4 dioxane

contamination at the Site is in addition to the remedial action work required by the ROD.

(Tr. 1/5/06 at 42, 45 (L. Dietz).)

87.    As part of the five-year review, the EPA has also asked the CSDG to evaluate the impacts

that pumping water from a nearby quarry has on ground water at the site and to do

modeling to determine the effect on MPA groundwater if the quarry were to stop

pumping.  (Tr. 1/5/06 at 45 (L. Dietz); Tr. 1/11/06 at 65-66 (C. Young); Pls.' Dietz Ex. 9

at 13.)

88.     In letters dated August 22, 2005, and November 2, 2005, Dietz told Young that the MPA

groundwater remedy will likely include contamination in the area of well CC-3 because

higher than historical levels of TCE were found in water samples from the well. (Tr.

1/11/06 at 86-91 (C. Young); Pls.' Dietz Ex. 7, 10.)

89.     The November 2, 2005 letter also asked the CSDG to include all the five-year review

items in a work plan to be submitted to the EPA on the remedial design of the MPA

ground water remedy.  The CSDG, through its contractor O'Brien & Gere, submitted

such a plan to the EPA shortly before the end of 2005.  (Tr. 1/5/06 at 48-49 (L. Dietz);

Pls.' Dietz Ex. 10 at 1-2, 11.)

90.     The "Main Plant Area Ground Water Investigation Work Plan" includes plans to monitor

and remediate 1,4 dioxane and soil vapor intrusion at the Site, as well as additional wells

to delineate the contaminant plume, the costs of which are still uncertain.  (Tr. 1/11/06 at

82-84, 104-05; Pls.' Young Ex. 6.)

91.     Regardless of whether bioremediation becomes part of the MPA groundwater remedy,

additional groundwater characterization studies will continue through the first quarter of

2007.  (Tr. 1/11/06 at 112 (C. Young).)

92.     The final design report for the MPA groundwater remedy will probably not be complete

until at least the first quarter of 2008.  Construction of the MPA groundwater remedy will

probably not begin until the second or third quarter of 2008.  (Tr. 1/11/06 at 119 (C.

Young).)


Costs Already Incurred

25

93. Young, the project coordinator, reviews bills from de maximis and the remediation contractors and makes recommendations to the CSDG's finance committee regarding payment.  He oversees the work reflected in those bills, which are for work performed in the investigation and remediation of the Site.  (Tr. 1/11/06 at 10-13 (C. Young).)

94. The CSDG finance committee, chaired by Scott Zelov, meets monthly, reviews all invoices submitted to the CSDG, and recommends to the group those invoices that have been approved for payment.  It also maintains the cash flow records of the grouat  (Tr. 1/4/06 at 161-62 (S. Zelov).)

95. All of the costs billed to the CSDG that Chris Young reviewed and submitted were for work performed in the investigation and cleanup of the Site.  (Tr. 1/11/06 at 13 (C. Young).)

96. As of the start of trial, the CSDG had incurred legal fees in this action of almost $1.4 million, including fees to pursue litigation against PRPs at the Site who had or have not yet settled.

97. The payments made by the CSDG to remediate the Site through November 30, 2005 were presented by Zelov in Plaintiffs' Zelov Exhibits 3 and 4.  Through November 30, 2005, the CSDG had spent the following amounts:

|   | Description | Amount | Supporting Documentation/Evidence |
|---|---|---|---|
| a | de maximis, inc., supervising contractor | $547,872 | Pls.' Zelov Ex. 4 |
| b | Golder Associates, contractor | $1,469,074 | Pls.' Zelov Ex. 4 |

| c | Philadelphia Suburban Water Company, for connecting Hillbrook circle neighborhood to public water supply | $350,150 | Pls.' Zelov Ex. 3 |
|---|---|---|---|
| d | ERM, for connecting the Hillbrook Circle neighborhood to a public water supply | $360,612 | Pls.' Zelov Ex. 3 |
| e | Connecting an additional property to a public water supply | $3,295 | Pls.' Zelov Ex. 3 |
| f | East Whiteland Township, for resurfacing the road after construction of the water line | $19,663 | Pls.' Zelov Ex. 3 |
| g | O'Brien & Gere, contractor constructing the remedy at the site | $1,401,882 | Pls.' Zelov Ex. 4 |
| h | Reimbursement of Commonwealth of Pennsylvania's response costs[6] | $60,461 | Pls.' Zelov Ex. 4 |
| i | Nihill & Riedley, for investigative forensic accounting in 1998 and 1999 (*Not recoverable as a response cost.*[7]) | ($9,616) | Pls.' Zelov Ex. 4 |
| j | National Fraud Center, for identifying and investigating potential PRPs and their financial condition (*Not recoverable as a response cost.*) | ($35,749) | Pls.' Zelov Ex. 4 |
| k | Shaw Environmental, for a study of the potential effectiveness of accelerated bioremediation | $11,692 | Pls.' Zelov Ex. 4 |
| l | Total allocable past response costs | $4,224,701 | |

98.    Through November 30, 2005 the CSDG had spent at least $4,224,701 in allocable

---

[6] The CSDG is required by the terms of the Consent Decree to reimburse the Commonwealth of Pennsylvania for response costs that the Commonwealth incurred with respect to the Site.  (Tr. 1/4/06 at 172 (S. Zelov); Pls.' Zelov Ex. 1 at 62, 64.)

[7] The Nihill & Riedley and National Fraud Center expenditures are not recoverable response costs because they were not directly aimed at remediation of the Site, but rather at collection of money from other PRPs, and thus are more akin to nonrecoverable attorney's fees. See discussion infra at at 53.

response costs.

99.    The O'Brien & Gere bid for construction of certain components of the remedy was

approximately $1.98 million, but the cost of that work is now projected to be about $2.3

million.  (Pls.' Ex. Smith 1 at 6 and Ex. C; Tr. 1/11/06 at 167-68 (C. Young).)


Future Costs of Site Remediation

100.    At trial, both sides presented expert witnesses to give opinion testimony regarding the

cost of remediating the Site.  Plaintiffs presented Jeffrey Smith ("Smith"), a registered

professional geologist with Langan Engineering and Environmental Services, and

defendants presented David R. Perry ("Perry"), a registered professional geologist with

American Geosciences, Inc.

101.    Both Smith and Perry are qualified to give opinion testimony regarding the cost to

remediate Superfund sites.

102.    I find Smith's testimony to be a more credible assessment of future costs at the Site,

because of his greater experience and because his cost estimates are largely based on the

actual O'Brien & Gere competitive bid for the contracting work.  I therefore adopt his

cost estimates as expressed in his cost tables at Exhibit C to Plaintiffs' Smith Exhibit 1,

and summarized in the following chart.  Perry's estimates from Defendants' Perry Exhibit

4 are presented for comparison purposes:

|  | Remedial Component | Court Estimate (based on Smith) | Perry Estimate |
|---|---|---|---|
| a | Soil Vapor Extraction (SVE) of the FDA soil | $2,822,970 | $2,785,265 |

| | | | |
|---|---|---|---|
| b | Monitored Natural Attenuation (MNA) of the FDA groundwater | $1,176,510 | $1,110,000 |
| c | Capping of the MPA soil | $1,147,356 | $1,305,444 |
| d | Costs for PCB soil excavation and disposal, non-demolition debris removal, and other | $438,684 | included elsewhere |
| e | "Pump and Treat" system for MPA groundwater | $12,425,081 | $6,015,751 (for the ROD remedy) |
| f | Monitored Natural Attenuation of MPA Groundwater | $1,176,509 | not included |
| g | **Total cost of remedy** | $19,274,846 | $11,216,450 |
| h | **Total future cost of remedy, with amount already paid to O'Brien & Gere for construction of the remedy subtracted**[8] | **$17,872,964** | |

103. The "pump and treat" estimate I adopt from Smith's report is higher than the estimate in the ROD because the extent and magnitude of the contamination found during the Pre-Design Investigation was higher than that found in the Remedial Investigation, requiring additional wells, additional piping from the wells to the treatment area, and higher operation and maintenance costs. (Tr. 1/6/06 at 44-45 (J. Smith).)

104. The potential additional costs for vapor intrusion and/or 1,4 dioxane remediation are not included among the contingencies outlined in Smith's cost estimate. (Tr. 1/5/06 at 105 (J. Smith).)

105. Leo Mullin ("Mullin") is an Environmental Protection Specialist with EPA Region 3.

---

[8] As noted above in my findings on past costs, the CSDG has already paid O'Brien & Gere $1,401,882 for partial construction of the ROD-required remedy. The entire O'Brien & Gere contract is included in the CSDG's estimate of total costs of implementing the remedy. To avoid double-counting the amounts already paid to O'Brien & Gere, the $1,401,882 must be subtracted from the total future costs.

Mullin has served as cost recovery expert for the Site since 1998.  (Tr. 1/6/06 at 36, 39
(L. Mullin).)

106.     EPA Region 3 tracks oversight costs at Superfund sites, which are costs the EPA incurs in
         overseeing the work performed by private parties at a site.  (Tr. 1/6/06 at 83, 85-86 (L.
         Mullin).)

107.     In each of the next three years, because of construction of the remedy, the EPA's
         oversight costs are likely to be approximately $250,000 at the Site.  After three years, the
         EPA's oversight costs at the Site could go down to $20,000 to $50,000 a year.[9]  (Tr.
         1/6/06 at 87 (L. Mullin).)

108.     On a present value basis, because the remedy could take 30 years to complete, EPA
         oversight costs at the Site are likely to be in the neighborhood of $1 million.  (Tr. 1/6/06
         at 87-88 (L. Mullin).)

109.     The Consent Decree requires the CSDG to reimburse the EPA for oversight costs at the
         Site "if the decision in United States v. Rohm & Haas Co., [2 F.3d 1265 (3d Cir. 1993)]
         regarding the liability of responsible parties under Section 107(a)(4)(A) of CERCLA for
         EPA oversight costs is reversed or overturned by the Court of Appeals for the Third
         Circuit, the United States Supreme Court, or the United States Congress."  (Pls.' Zelov
         Ex. 1, pp. 64-65.)  The Third Circuit explicitly overturned Rohm & Haas shortly before
         trial of this case, in United States v. E.I. DuPont de Nemours, 432 F.3d 161 (3d Cir.

---

[9] The lawsuit recently instituted by the EPA against the Simon Entities (Civil Action No.
06-CV-928 (E.D. Pa.)) may seek recovery of these same oversight costs from the Simon Entities,
because PRPs are jointly liable for the EPA's response costs at the Site under CERCLA §
107(a)(4)(A).

2005).

Total Site Costs

110.    I find that the total site costs are as follows:

|   | Expense | Cost |
|---|---------|------|
| a | Cost of the ROD-specified remedies for the four areas, not counting amounts already paid to O'Brien & Gere for partial construction of the remedy. | $17,872,964[10] |
| b | Costs to remediate the site already incurred by the CSDG | $4,224,701[11] |
| c | EPA Oversight Costs | $1,000,000[12] |
| d | **Total estimated site costs (a + b + c)** | **$23,097,665** |

The Simon Entities' Cooperation With EPA and the CSDG

111.    The EPA prepared a Volumetric Ranking Summary ("VRS") for the Site, totaling the

volume of material attributed to specific parties related to the Site.  (Tr. 1/6/06 at 39-40

(L. Mullin); Pls.' Mullin Ex. 1.)

112.    The EPA also prepared a Comprehensive Transaction Report ("CTR") allowing EPA and

all interested parties to focus on specific entities and to look at the dates and volumes of

each specific transaction.  (Tr. 1/6/06 at 42 (L. Mullin); Pls.' Mullin Ex. 2.)

113.    The VRS and CTR were based on primary source documents produced to the EPA by

---

[10] See Finding of Fact No. 98(h).

[11] See Finding of Fact No. 98.

[12] See Mullin's estimate at Finding of Fact No. 108.

31

Chemclene, and provided to the various PRPs.  (Tr. 1/6/06 at 43-45 (L. Mullin).)

114.   The EPA reached a settlement with certain <u>de</u> <u>minimis</u> PRPs at the Site in 1998 or 1999.
       This first round <u>de</u> <u>minimis</u> settlement charged settling parties an amount using the VRS
       and the cost estimates in the ROD, and adding a 50% premium to adjust for potential cost
       overruns, to cover potential shortfalls from PRPs who became defunct or otherwise
       unable to pay, and to provide a final and expeditious settlement to <u>de</u> <u>minimis</u> PRPs.
       Over 160 PRPs accepted the EPA's first round <u>de</u> <u>minimis</u> settlement offer.  (Tr. 1/6/06 at
       46-47 (L. Mullin).)

115.   The EPA made a second round <u>de</u> <u>minimis</u> settlement in 2001 at the request of certain
       PRPs.  The premium for the second round settlement was 50% plus an additional 10% for
       those parties who were offered but had declined to participate in the first round
       settlement.  Nine parties accepted the second round <u>de</u> <u>minimis</u> settlement offer.  (Tr.
       1/6/06 at 51-55 (L. Mullin); Pls.' Mullin Ex. 11.)

116.   The third round <u>de</u> <u>minimis</u> settlement offer was made after the Complaint in this action
       was filed.  Over fifty parties accepted the third round <u>de</u> <u>minimis</u> settlement offer, with a
       premium of 125% for parties for whom the third round offer was the initial offer, and
       225% for those parties who were offered but declined to participate in an earlier
       settlement.  (Tr. 1/6/06 at 53-56 (L. Mullin); Pls.' Mullin Ex. 12.)

117.   The premiums charged by the EPA in its <u>de</u> <u>minimis</u> settlements at the Site were
       consistent with the EPA policy of using a tiered approach to settlements, designed to
       settle parties quickly, minimize costs, and discourage parties from profiting by delaying
       settlement.  (Tr. 1/6/06 at 61 (L. Mullin).)

118.   The EPA counted 289 viable PRPs at the Site, 288 of which have either settled with the

EPA or have term sheets to settle with EPA.  Simon Wrecking is the only viable PRP that

has not settled its liability with the United States.  (Tr. 1/6/06 at 65-66 (L. Mullin).)

119.   The Simon Entities have been signatories to numerous other Consent Decrees and EPA

Administrative Orders by Consent regarding other Superfund Sites.  The Simon Entities

have paid money pursuant to these agreements.  (Defs.' Mullin Ex. 1-9; Tr. 1/19/06 at 46

(D. Simon).)

120.   The Simon Entities filed an insurance coverage action against their insurance companies

to obtain environmental coverage for their potential liability at fifteen (15) Superfund

sites other than the Site ("First Coverage Action").  (Tr. 1/19/06 at 121-125 (D. Simon).)

121.   The First Coverage Action was settled and the Simon Entities formed a trust for the

purpose of applying the settlement proceeds toward resolution of the fifteen specific

covered sites that formed the basis of the First Coverage Action (the "Trust").  (Tr.

1/19/06 at 127-28, 137, 141 (D. Simon).)

122.   David Simon and Joseph Simon are co-Trustees of the Trust, and neither has ever

received compensation as co-Trustee.  (Tr. 1/19/06 at 5, 9, 118-19, 121 (D. Simon).)

123.   The Site was not a subject of the First Coverage Action and is not one of the 15 covered

sites for which a separate sub-trust of the Trust was established.  David Simon

determined in his capacity as co-Trustee that the Trust could not be used to pay for any

costs arising out of the Site.  (Tr. 1/19/06 at 10, 14, 137-38, 142 (D. Simon); Defs.'

Simon Ex. 1.)

124.   On or about November 14, 1996, the EPA sent a "General Notice Letter"and a "Special

Notice Letter" to Simon Wrecking c/o Simon Resources and several other PRPs, requesting payment or submission of a good faith offer to do the work at the Site.  (Tr. 1/6/06 at 71-72 (L. Mullin); Pls.' Mullin Ex. 3, 4, 6-9.)

125.   The Simon Entities instituted an insurance coverage action to obtain coverage for the Site (the "Malvern Coverage Action").  The Simon Entities had insurance coverage during the relevant time period and brought the Malvern Coverage Action in an attempt to receive insurance coverage to go toward remediation of the Site.  (Tr. 1/19/06 at 50-51 (D. Simon).)

126.   David Simon met with Mullin at the EPA on several occasions without counsel, beginning several years ago, and provided him with a substantial amount of documentation.  (Tr. 1/19/06 at 96-97 (D. Simon); Tr. 1/6/06 at 112-13 (L. Mullin); Tr. 1/10/06 at 25 (L. Mullin).)

127.   Simon brought Mullin the Trust Agreement for his review, which Mullin reviewed and questioned him about.  Simon did not show Mullin the schedule of funds, and did not leave the Trust Agreement with Mullin because of his concern about the confidentiality of provisions of the underlying insurance settlements and his concern about being sued by the insurers.  (Tr. 1/19/06 at 96-98 (D. Simon); Tr. 1/20/06 at 27-29 (L. Mullin).)

128.   Under the EPA's "ability to pay" policy, the EPA is willing to reduce the amount of its claim against a party to an amount that will prevent an undue financial hardship to the party.  This policy requires EPA review of certain financial information.  (Tr. 1/6/06 at 74 (Mullin).)

129.   Mullin participated in telephone conversations with David Simon about Simon

34

Wrecking's liability as a PRP for a period of a year.  (Tr. 1/6/06 at 112-13 (L. Mullin).)

130.   Simon provided documents to Mullin at his request, of which Mullin retained copies.
Simon provided Mullin with 25 years' worth of tax returns for Simon Wrecking. (Tr.
1/20/06 at 32, 36 (L. Mullin).)

131.   David Simon also had meetings with Joan Johnson and Robert LeFevre of EPA to discuss
settlement or participation in the cleanup of the Site.  (Tr. 1/20/06 at 40 (L. Mullin).)

132.   Since 1997, 90% to 95% of the parties requesting an "ability to pay" settlement in EPA's
Region 3 have not reached one because the parties do not want to comply with the
financial disclosure requirements.  (Tr. 1/6/06 at 76 (L. Mullin).)

133.   Simon Wrecking did not provide sufficient documentation to determine whether Simon
Wrecking was eligible for an "ability to pay" settlement with respect to the Site.  (Tr.
1/6/06 at 77, 114 (L. Mullin).)

134.   On December 4, 1998, the EPA sent a 104(e) information request letter to Samuel Simon,
President of Simon Wrecking, c/o Simon Resources, requesting information about the
Trust and affiliated companies.  Simon Wrecking did not provide the EPA with the
information requested in the 1998 104(e) information request letter. (Tr. 1/4/06 at 115
(Simon Entities).)

135.   In October 2005 the EPA sent another 104(e) information request letter to Samuel Simon,
requesting information about trust agreements and insurance settlements.  Simon
Resources did not provide the EPA with any of the information requested by the 2005
104(e) request letter until after the Simon Entities were ordered by the Court at trial in
this matter to produce the trust agreement to plaintiffs on January 18, 2006.  (Tr. 1/6/06 at

89-91 (L. Mullin); Tr. 1/19/06 at 92-96 (D. Simon); Pls.' Mullin Ex. 16.)

136.  David Simon, who has assisted his father Samuel Simon with environmental matters on

      behalf of the Simon entities for 20 years, authorized Simon Wrecking's joinder in the

      Malvern Site Study Group, the predecessor to the CSDG.  (Tr. 1/19/06 at 47, 68 (D.

      Simon).)

137.  On July 7, 1997, Simon Wrecking forwarded a check for $750 to the Malvern Site Study

      Group and enclosed a signed agreement to participate in the Group.  (Pls.' Stevens Ex. 2;

      Tr. 1/9/06 at 22 (M. Stevens); Tr. 1/19/06 at 47-48 (D. Simon).)

138.  By letter of January 28, 1998, Simon Wrecking paid a second $750 assessment for its

      share of expenses of the Malvern Site Study Group.  (Pls.' Stevens Ex. 3; Tr. 1/9/06 at 24

      (M. Stevens); Tr. 1/19/06 at 48-49 (D. Simon).)

139.  On July 9, 1998, Jim Morris, attorney for the CSDG, forwarded to Simon Wrecking and

      others a copy of a Potential Responsible Parties ("PRP") Agreement for execution.  The

      PRP Agreement provided for cooperation of PRPs in remedial activities at the Site.  (Pls.'

      Stevens Ex. 10.)

140.  Simon Wrecking's representative executed this Agreement on July 23, 1998 and

      forwarded a copy of the execution page to Stevens for the CSDG.  (Pls.' Stevens Ex. 11.)

141.  After execution of the signature page, Simon Wrecking was a PRP group member.  (Tr.

      1/12/06 at 35 (M. Stevens).)

142.  In August and September 1998 the CSDG – which included Simon Wrecking and other

      companies – made good faith offers to conduct or finance appropriate remedial action at

      the Site.  (Pls.' Stevens Ex. 6, 13.)

143.     In an August 17, 1998 memo from Stevens, an assessment was made of PRP Group members, charging $5,500.00 to members of the former Malvern Site Study Group, which included Simon Wrecking.  (Pls.' Stevens Ex. 20.)

144.     Before October 7, 1998, Stevens had a telephone conversation with Steven Yermish ("Yermish") of Caplan & Luber, LLP, Simon Wrecking's counsel at that time.  During that conversation, Stevens asked Yermish when Simon Wrecking would pay its initial assessment, but Yermish could not tell Stevens when that would happen.  (Tr. 1/9/06 at 53; Tr. 1/12/06 at 84 (M. Stevens).)

145.     Before October 7, 1998, the CSDG met and decided that Simon Wrecking was no longer part of the CSDG, because it had not paid its initial assessment and could not tell Stevens when it would pay its initial assessment.  (Tr. 1/9/06 at 52-53; at 178-79 (M. Stevens).)

146.     On October 7, 1998, Stevens, as acting CSDG liaison counsel, wrote a letter to Simon Wrecking's counsel explaining that Simon Wrecking had been removed from the group for not paying its initial assessment, but leaving open the possibility that it could be an additional member subject to the approval of the CSDG members.  (Tr. 1/9/06 at 54-58 (M. Stevens); Pls.' Stevens Ex. 18.)

147.     By letter of October 21, 1998, Yermish enclosed Simon Wrecking's check in the amount of $5,500.00 for the initial assessment of shared costs, but Stevens returned the check. (Pls.' Stevens Ex. 19, 23.)

148.     By letter of October 30, 1998, Stevens requested that Simon Wrecking provide the CSDG with corporate and financial information about the company before accepting it as a member.  Simon Wrecking never provided the CSDG with the requested information.

37

(Tr. 1/9/06 at 70 (M. Stevens); Tr. 1/12/06 at 103-108 (M. Stevens); Pls.' Stevens Ex. 20.)

149.    The CSDG continued to negotiate with the EPA and eventually signed a Consent Decree with the EPA with respect to the Site on June 17, 1999.  Simon Wrecking neither signed that Consent Decree nor a separate consent decree with respect to the Site.  (Tr. 1/9/06 at78 (M. Stevens); Pls.' Zelov Ex. 1.)

150.    On April 12, 2001, Stevens, acting as CSDG liaison counsel, wrote letters to Steven Yermish and Sharon Morgan, counsel for Simon Wrecking, as well as to Samuel Simon, President of Simon Resources, demanding that Simon Wrecking pay $7,997,102.65 to settle the CSDG's claim against Simon Wrecking with respect to the Site.  (Tr. 1/9/06 at 79-82 (M. Stevens); Pls.' Stevens Ex. 24, 25, 26.)

151.    After receipt of the April 2001 letter, counsel for Simon Wrecking met with Stevens on several occasions to try to reach an "ability to pay" settlement, but could not obtain assurances of confidentiality of any financial information provided to the CSDG, and therefore did not provide the information the CSDG requested.  (Pls.' Stevens Ex. 24; Tr. 1/9/06 at 85-86 (M. Stevens); Tr. 1/12/06 at 59-60 (M. Stevens).)


Allocation

152.    The CSDG has collected or can expect to collect the following funds from settling PRPs, with "add backs" noted for defaulting parties or parties who have joined the CSDG:

38

|   | Source | Evidence | Amount |
|---|--------|----------|--------|
| a | EPA de minimis funding | Tr. 1/13/06 at 57-58 (R. Dovell); Pls.' Dovell Ex. 3 | $2,676,894 |
| b | CSDG cash out settlements and settlements with the U.S. Army, NIH etc. | Tr. 1/13/06 at 58-59 (R. Dovell); Pls.' Dovell Ex. 3 | $3,386,439 |
| c | smaller settlements and funds from cash-out parties | Tr. 1/13/06 at 61-62 (R. Dovell); Tr. 1/17/06 at 76-79 (R. Dovell); Pls.' Dovell Ex. 3 | $128,564[13] |
| d | Settlements with Quaker City, Inc., Ametek, Inc., and McClarin Plastics, Inc. on the eve of trial | Tr. 1/13/06 at 62 (R. Dovell); Pls.' Dovell Ex. 3 | $981,861 |
| e | Amounts cash out parties must pay if clean up of the MPA exceeds $14,925,000 | Tr. 1/13/06 at 63-64 (R. Dovell); Tr. 1/17/06 at 75-76 (R. Dovell); Pls.' Dovell Exs. 3, 7 | $107,711 |
| f | Chemclene settlement | Settlement agreement of October 5, 2005 between Chemclene and CSDG | X (contingent and unknown) |
| g | Defaulted settlement obligations of Princo Instruments and Kosempel | Tr. 1/13/06 at 65 (R. Dovell); Pls.' Dovell Ex. 3 | ($92,028) |
| h | Ametek's unpaid share of EPA de minimis funding; eventual settlement counted separately | Tr. 1/13/06 at 65-66 (R. Dovell); Pls.' Dovell Ex. 3 | ($178,787) |
| i | AMP's unpaid share of de minimis funding; AMP later became a CSDG member | Tr. 1/13/06 at 66 (R. Dovell); Pls.' Dovell Ex. 3 | ($264,984) |

---

[13] This figure is the sum of three lines of settlements noted in Plaintiffs' Dovell Ex. 3: "Additional funds from Cash Out Parties" ($18,810); "Technitrol, Inc. - de minimis settlement" ($38,854); and "Additional Settlements since 4/20/05" ($70,900).

| j | Tyco's partial settlement payment; Tyco became a CSDG member and its share is now accounted for in CSDG drum count | Tr. 1/13/06 at 66-68 (R. Dovell); Pls.' Dovell Ex. 2, 3 | ($115,000) |
|---|---|---|---|
| k | **Total amount received or expected by CSDG from other PRPs** | | **$6,630,670 + X** (X represents the amount of the Chemclene settlement) |

153.  Plaintiffs' allocation expert Ray Dovell ("Dovell") is a Certified Public Accountant

(CPA) and has been a forensic accountant since 1987.  He has expertise in forensic

accounting and is qualified to testify regarding forensic accounting issues.  (Tr. 1/13/06 at

24-25 (R. Dovell).)

154.  Defendants' allocation expert Christopher Wittenbrink ("Wittenbrink") is a biologist who

since 1989 has worked as an allocation consultant for environmental remediation

projects.  He has expertise in CERCLA allocations and is qualified to testify regarding

allocation.  (Defs.' Wittenbrink Ex. 1 App. A.)

155.  Dovell calculated the relative volumetric shares of the CSDG and Simon Wrecking,

ignoring the volumetric shares of other PRPs who have settled or have been dismissed.

He then subtracted the amount of settlement money received by the CSDG from other

parties and split the remaining costs between the CSDG and Simon Wrecking according

to their relative volumetric shares.  (Pls.' Dovell Ex. 2.)

156.  Wittenbrink calculated the volumetric shares of the CSDG and Simon Wrecking out of

the total number of drums documented at the site.  He also calculated the volumetric

shares of other groups of settled PRPs.  (Defs.' Wittenbrink Ex. 3 at 3.)

157.   Wittenbrink objected to Dovell's inter-class allocation share between waste generators and transporters, which he argued unfairly increased Simon Wrecking's share, his failure to account for the shares of settled parties in the allocation, his failure to address the issue of orphan shares, the owner-operator share, and its reliance on the VRS.  (Defs.' Wittenbrink Ex. 2.)

158.   Because I adopt the pro tanto [14] method of accounting for the CSDG's settlements with other PRPs in my conclusions of law, I use Dovell's approach to calculate Simon Wrecking's volumetric share, taking into account Wittenbrink's objections to its methodology to arrive at slightly different numbers, as summarized in the following chart:

|   | Item | Dovell's Calculation[15] | Court's Finding |
|---|------|--------------------------|-----------------|
| a | Simon Wrecking's adjusted drum count | 1,136.01 | 878.86 |
| b | CSDG's adjusted drum count | 13,190.51 | 13,190.51 |
| c | Total adjusted drum count of CSDG and Simon Wrecking combined | 14,326.52 | 14,069.37 |
| d | Simon Wrecking's volumetric share of the combined drum count in (c) | 7.93% | 6.25% |
| e | CSDG's volumetric share of the combined drum count in (c) | 92.07% | 93.75% |
| f | Total estimated site costs[16] | $23,631,953 | $23,097,665 |

---

[14] See discussion infra at pp. 59ff.

[15] See Pls.' Dovell Ex. 2.

[16] Costs of remediating the Site as required by the 1999 Consent Decree and the 1997 ROD, as amended.

| g | Settlements received or expected by the CSDG | $6,630,670 | $6,630,670 + X |
|---|---|---|---|
| h | Total site costs after settlements are subtracted | $17,001,283[17] | $16,466,995 - X |
| i | CSDG's share of total estimated site costs less settlements | 92.07% of $17,001,283, = $15,653,081 | 93.75% of ($16,466,995 - X) |
| j | **Simon Wrecking's share of total estimated site costs less settlements** | 7.93% of $17,001,283, = $1,348,201 | **6.25% of ($16,466,995 - X)** |

159.   Because the remedy will take many years to implement, the conditions at the Site are

changing, and the EPA is already requiring the CSDG to expend resources investigating

and possibly remediating contamination that was not addressed in the 1997 ROD (e.g.,

vapor intrusion and 1,4 dioxane contamination), the actual amount the CSDG will have to

spend at the Site is uncertain.

160.   An uncertainty premium of 50% on Simon Wrecking's share is the value of 50% x

[6.25% x ($16,466,995 - X)] or 3.13% x ($16,466,995 - X).  The combined value of

Simon Wrecking's adjusted share plus the premium is (6.25% + 3.13%) x ($16,466,995 -

X), which simplifies to 9.38% x ($16,466,995 - X).

Successor Liability of Simon Resources and Mid-State Trading

161.   In Simon Resources et al. v. Simon Holdings Inc. et al., Civ. No. 86-02288 (Lycoming

Cty. Court of Common Pleas), Simon Resources asserted that it acquired the common

stock and physical assets of Simon Wrecking in or about 1979 and continued to operate

Simon Wrecking's scrap metal business at least through 1992.  (Aug. 21, 1992 letter from

---

[17] Not counting the CSDG's $156,793 estimate for prejudgment interest.

Richard L. Caplan, Esq. to Hon. Kenneth D. Brown re: <u>Simon Resources et al. v. Simon</u>
<u>Holdings Inc. et al.</u>, Civ. No. 86-02288 (Lycoming Cty. Court of Common Pleas)
(Lycoming Litigation Binder Tab 4).)

162.   At or about the time Simon Resources was formed, Simon Wrecking ceased its scrap
metal business, transferred all its physical assets other than two parcels of land to Simon
Resources, and became an inactive corporation.  Simon Resources, as Simon Wrecking's
successor, continued to operate the identical scrap metal business from the identical
location using Simon Wrecking's former plant and equipment.  (Tab 3 at 3, Lycoming
Litigation Binder ("Memorandum of Law in Support of Plaintiffs' Motion for Partial
Summary Judgment".)

163.   Simon Wrecking's business operations and assets were merged into Simon Resources in
1981.  (Tab 8 at 3, Lycoming Litigation Binder ("Plaintiffs' Pretrial Memorandum").)

164.   In a schedule to its 1981 corporate tax return, Simon Resources reported to the Internal
Revenue Services that Simon Wrecking, as a wholly owned subsidiary, had been merged
into Simon Resources on January 1, 1981, in a tax-free merger pursuant to § 368 of the
Internal Revenue Tax Code.  Samuel Simon verified these facts in a verification
submitted to the Common Pleas Court of Lycoming County, Pennsylvania.  Samuel
Simon was the vice president of Simon Resources and on the board of directors of Simon
Resources at the time of the filing of the 1981 corporate tax return.  (Tr. 1/19/06 at 53-60
(D. Simon); Tab 3 at 4, Lycoming Litigation Binder ("Memorandum of Law in Support
of Plaintiffs' Motion for Partial Summary Judgment"); Tab 2, ¶ 13 ("Motion for Partial
Summary Judgment") and Ex. 2 (at 204a), Lycoming Litigation Binder.)

165.   In its Amendment to Plaintiffs' Amended Complaint in the Lycoming County litigation,
       Simon Resources asserted that in 1980, Simon Wrecking became a wholly owned
       subsidiary of Simon Resources; that in 1981, Simon Resources took over the operation of
       the business of Simon Wrecking and continued it; that Simon Resources retained the
       same employees, production facilities, equipment, location, customers, assets,
       management, and ownership of Simon Wrecking; that subsequent to 1981, Simon
       Wrecking remained in existence only as a corporate shell wholly owned by Simon
       Resources; and that by virtue of the de facto merger of Simon Wrecking into Simon
       Resources, Simon Resources became liable for the environmental liabilities of Simon
       Wrecking.   (Tab 5, Lycoming Litigation Binder ("Amendment to Plaintiffs' Amended
       Complaint").)

166.   Simon Wrecking cannot be formally dissolved as a corporation because of the
       outstanding contingent environmental liabilities asserted against it and the environmental
       lawsuits naming it as a defendant.  (Tab 8 at 6 n. 1, Lycoming Litigation Binder
       ("Plaintiffs' Pretrial Memorandum").)

167.   The Lycoming Court of Common Pleas did not rule on the issue of whether Simon
       Wrecking merged into Simon Resources or whether Simon Resources was a successor to
       Simon Wrecking.  (Lycoming Litigation Binder, Ex. 9.)

168.   At trial, David Simon testified that waste transportation assets of Simon Wrecking, along
       with its PUC authority, were transferred to Mid-State Trading in 1981 and 1982.  (Tr.
       1/19/06 at 38-39.)

169.   David Simon was an officer of Mid-State Trading, but was neither an officer nor

44

employee of Simon Wrecking or Simon Resources at the time of the transfer of assets. (Tr. 1/12/06 at 140-48.)  Therefore I find his testimony less probative than the litigation papers authorized by Samuel Simon, officer of Simon Resources.

170.   David Simon testified that two employees of Simon Wrecking who were drivers in the waste transportation part of the business became employees of Mid-State Trading, where they continued to work as drivers.  (Tr. 1/19/06 at 35-36 (D. Simon).)

171.   David Simon testified that two employees of Simon Wrecking in the scrap metal operation eventually became employees of Simon Resources and continued work in the scrap metal business.  (Tr. 1/19/06 at 36 (D. Simon).)

172.   David Simon testified that Simon Resources did not engage in the waste hauling business and did not hold a Public Utilities Commission ("PUC") license nor did it receive the waste transportation assets of Simon Wrecking.  (Tr. 1/19/06 at 43-44 (D. Simon).)

173.   Samuel Simon is the president of Simon Resources and its only officer, director and shareholder.  (Tr. 1/19/06 at 80 (D. Simon).)

174.   Samuel Simon is the sole officer and director of Mid-State Trading.  Mid-State Trading is wholly owned by Simon Resources.  (Tr. 1/19/06 at 79 (D. Simon).)

175.   Simon Wrecking has been an inactive corporation since the early 1980s.  Samuel Simon is listed as president and the only officer and director.  Simon Resources owns 100% of the shares of Simon Wrecking.  (Tr. 1/19/06 at 74-77, 79-80) (D. Simon); Pls.' Simon Ex. 5, 6.)

176.   Simon Resources, Simon Wrecking and Mid-State Trading all share the same principal location: 2525 Trenton Avenue, Williamsport, Pennsylvania.  (Tr. 1/19/06 at 75-78 (D.

Simon); Tab 1, Lycoming Litigation Binder ("Amended Complaint").)

**CONCLUSIONS OF LAW**

**I.     The CSDG's Right to Bring a CERCLA § 113 Suit Against the Simon Entities**

As a threshold issue, the Simon Entities argue that the CSDG is precluded from maintaining a contribution action against any non-settling PRPs, including the Simon Entities, because the CSDG has yet to be compelled to pay more than its fair share of cleanup costs. This argument is without merit. It is true that as of trial, the CSDG had collected $6,630,670 in actual or expected settlements, which is more than the $4,224,701 that the CSDG had spent on Site remediation. When the CSDG signed the 1999 Consent Decree with the EPA, however, it incurred liability for the entire cost of remediating the Site.

CERCLA is a comprehensive statute enacted by Congress in 1980 "in response to the serious environmental and health risks posed by industrial pollution." United States v. Bestfoods, 524 U.S. 51, 55 (1998). In 1986, Congress amended CERCLA to expressly create a cause of action for contribution under Section 113. See 42 U.S.C. § 9613(f). Section 113 explicitly authorizes a person held jointly and severally liable under CERCLA to seek contribution from other PRPs "'when the person believes that it has assumed a share of the cleanup or cost that may be greater than its equitable share under the circumstances.'" New Castle Cty. v. Halliburton NUS Corp., 111 F.3d 1116, 1122 (3d Cir. 1997) (quoting H.R. Rep. No. 99-253(I) at 79 (1985)). That is precisely what the CSDG has done by bringing this action against the Simon Entities, who were the only remaining viable PRPs at the Site by the time of

46

trial.

The CSDG's Consent Decree with EPA provided that settling defendants could commence a contribution action pursuant to 42 U.S.C. § 113(f)(2) against non-settling PRPs. CERCLA § 113(f)(2) states that "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title."  42 U.S.C. § 113(f)(2).  Under CERCLA § 113, contribution "denotes a claim 'by and between jointly and severally liable parties for an appropriate division of the payment one of them has been compelled to make.'"  In re Reading Co., 115 F.3d 1111, 1120 (3d Cir. 1997).  Under § 113 a PRP held liable for the entire response cost to seek contribution from other PRPs "when the person believes that it has assumed a share of the cleanup or cost that may be greater than its equitable share under the circumstances."  Id. at 1119 (citing S. Rep. No. 11, 99th Cong., 1st Sess. at 44 (1985)).  This focus on the assumption rather than actual payment of costs supports allowing the CSDG to sue for contribution because it incurred the cost of the entire cleanup at the time it agreed with the EPA to undertake the entire cleanup.

Some district courts in the Third Circuit have held that the actual payment of more than a party's equitable share of the total liability is a prerequisite to bringing a contribution suit, but the situations they address are factually dissimilar to the one before me.   In these other cases, the PRP seeking to recover response costs had neither been sued nor had resolved its liability with the EPA.  See E.I. Du Pont de Nemours and Co. v. U.S., 297 F. Supp. 2d 740 (D.N.J. 2003) (site owner sued U.S. for contribution before the site owner had been sued); Andritz Sprout-Bauer, Inc. v. Beazer East, Inc., 12 F. Supp. 2d 391 (M.D. Pa. 1998) (plaintiff neither had judgment entered against it nor had been compelled to pay money to a third party).  Those district courts

expressed concern over the possibility that plaintiff PRPs could recover costs that they had not been compelled to make.  Those concerns are absent here, where pursuant to the Consent Decree with the EPA, the CSDG has committed to carrying out and has already spent millions of dollars on a clean up that could take thirty years or more.

The Consent Decree establishes that the CSDG will incur the full cost of cleanup, and creates a continuing responsibility to complete the cleanup.  The commitment in this case contrasts with the facts of In re Dant & Russell, Inc., 951 F.2d 246 (9th Cir. 1991), heavily relied on by the Simon Entities, where the Ninth Circuit held that a bankruptcy court could not award a CERCLA §107 plaintiff future costs of remediation based on "bare assertions by [the plaintiff] that [it] will perform future cleanup."  Id. at 250.  Requiring the CSDG to come back to court repeatedly over decades each time its actual spending exceeds its fair share plus settlement money received from other PRPs would be an inefficient solution and is not required by the statute.  In this case, the CSDG's legal commitment to clean up the Site pursuant to the Consent Decree imposed upon it the entire cost of cleanup, which is significantly higher than the amount the CSDG has collected from other PRPs.   Therefore the CSDG is entitled to maintain this contribution suit under CERCLA § 113 against the Simon Entities.


**II.    Simon Wrecking's Liability Under CERCLA**

Under § 107 of CERCLA, the CSDG had to prove four elements to establish the Simon Entities' liability: (1) that defendants are potentially responsible parties ("PRPs"); (2) that hazardous substances were disposed of at a "facility"; (3) that there has been a "release" or "threatened" release of hazardous substances from the facility into the environment; and (4) that

the release or threatened release has required or will require the plaintiff to incur "response

costs." See 42 U.S.C. § 9607(a); New Jersey Turnpike Auth. v. PPG Indus., Inc., 197 F.3d 96,

103-04 (3d Cir. 1999).  The parties agree that the last three requirements are met.  The only

disputed element at trial was whether the Simon Entities are PRPs.

  To be a PRP, a party must be either an owner or operator of a hazardous waste site or a

generator, arranger, or transporter of waste sent to the site.  The CSDG contends that Simon

Wrecking is liable as both an arranger and a transporter of waste to the Site.  Because Simon

Wrecking was a waste hauling company, it makes the most sense to evaluate its liability first

under the transporter definition.  A "transporter" under CERCLA is

> any person who accepts or accepted any hazardous substances for transport to disposal or
> treatment facilities, incineration vessels or sites *selected by such person*, from which there
> is a release, or a threatened release which causes the incurrence of response costs, of a
> hazardous substance.

Id. § 9607(a)(4) (emphasis added).[18]  All the parties agree that Simon Wrecking transported

waste generated by other entities to the Site, but the Simon Entities argue that there is insufficient

evidence to prove that Simon Wrecking itself selected the Site for the disposal of the waste it

transported.

  Under Third Circuit jurisprudence, to be liable as a transporter, the waste hauler must at

least have actively participated in the decision as to where to dispose of the waste generator's

---

[18] By way of comparison, the definition of "arranger" under CERCLA is
> any person who by contract, agreement, or otherwise arranged for disposal or treatment,
> or arranged with a transporter for transport for disposal or treatment, *of hazardous*
> *substances owned or possessed by such person*, by any other party or entity, at any facility
> or incineration vessel owned or operated by another party or entity and containing such
> hazardous substances.

42 U.S.C. § 9607(a)(3) (emphasis added). Because of the ownership and possession aspect of this
definition, it does not naturally fit waste haulers.

waste.  Tippins Inc. et al. v. USC Corp. et al., 37 F.3d 87 (3d Cir. 1994).  In Tippins, the

defendant, Petroclean, Inc., was a waste hauler hired to transport hazardous waste for the plaintiff

Tippins.  Petroclean contacted two disposal sites, gathered information about them, and

presented them both to Tippins, which chose the site that later became the subject of CERCLA

remediation.  In finding Petroclean liable as a transporter, the court held that a transporter selects

the disposal facility and thereby incurs CERCLA liability "when it actively and substantially

participates in the decision-making process which ultimately identifies a facility for disposal."

Id. at 90.

        Based on the evidence presented at trial, I find it more likely than not that Simon

Wrecking actively and substantially participated in the decisions to dispose of its customers'

waste at the Site.  Although there is no direct evidence that Simon Wrecking chose the Site, there

is sufficient circumstantial evidence to infer that it did so a substantial portion of the time.

Employees of Chemclene, the owner and operator of the Site, did not know where Simon

Wrecking's waste originated.  In contrast, Chemclene employees knew the identity of the

originators of waste solvent dropped off at Chemclene by the other transporting firms such as

RTS, Eldredge and Keystone Block.  (Tr. 1/9/06 at 14-15 (J. Lupo).)  Chemclene employee Lupo

testified that Chemclene did not have the same kind of relationship with these other waste

haulers as they did with Simon Wrecking, because the other haulers were merely hired by the

generators to bring waste to Chemclene.  (Id.)   As far as he and the other Chemclene employees

could remember, neither Letterkenny nor Supelco, both customers of Simon Wrecking, were

customers of Chemclene.  This testimony raises an inference that Simon Wrecking, and not its

waste generating customers, selected the Site, because otherwise Chemclene employees would

have had some interaction with those customers.

Evidence regarding the waste from Letterkenny Army Depot also supports a finding that Simon Wrecking actually and substantially participated in selecting the Site.  In correspondence about waste hauled from Letterkenny to the Site on December 1, 1978, Balderston, the president of Chemclene, wrote to Samuel Simon, the president of Simon Wrecking, in reference to "your [Simon's] government contract no. DAAG34-79."  (Pls.' Balderston Ex. 5.)  In the letter, Balderston assured Simon that the used trichlorethylene transported by Simon Wrecking "will be reprocessed for reuse in accordance with all applicable local, state and federal regulations."  (Id.) Correspondence from Balderston to Simon about the suitability of disposing of waste at the Site would be unlikely if Simon Wrecking had no input into the selection of the Site.  A reasonable explanation for such a letter is that Simon Wrecking was actively advising Letterkenny that Chemclene was in compliance with waste-related laws and regulations, and thus was taking an active role in site selection.

A purchase order from 1975 consigning Letterkenny waste to Simon Wrecking provides further evidence of Simon Wrecking's substantial involvement in site selection.  Adrien Reeder, a contracting officer at Letterkenny, signed a purchase order on November 18, 1975, for the removal of waste by Simon Wrecking.  (Pls.' Reeder Ex. 1.)  Reeder testified at trial that it was the policy of Letterkenny not to tell a transporter where to take waste unless that information was in the contract, which it was not in this case.  The document and his testimony suggest that Simon Wrecking, rather than Letterkenny, must have chosen where to take the waste.

Additional facts bolster the inference that Simon Wrecking had substantial input in selecting the Site.  Simon Wrecking brought numerous loads of waste, presumably from different

51

customers, to the site over a period of years.  It is reasonable to infer that this sustained, long-term relationship was not a coincidence.  More likely, it was Simon Wrecking's input into site selection that led to Simon Wrecking bringing so many loads of waste to the Site.

Simon Wrecking produced almost no evidence that would shed light on who made the decision to select the Site, or how.  The only evidence the Simon Entities introduced to show the involvement of a waste generator in selecting the Site was a straight bill of lading from Letterkenny dated September 23, 1976.[19]  The bill of lading consigned materials directly from Letterkenny to Chemclene, demonstrating that Letterkenny was aware of the waste's destination and intended it to be the Site.  (See Defs.' Reeder Ex. 2.)  This document does not negate the evidence that Simon Wrecking had at least "substantial input" in choosing the Site for waste disposal at other times.  It does, however, indicate that at least some of the time, Simon Wrecking was not substantially involved in choosing the Site.  The extent of Simon's responsibility as a transporter – that is, the percentage of the total barrels that Simon can be held to have played an active and substantial role in directing to the Site – is a separate issue.  That issue will be dealt with in conjunction with the following section on allocation.

Because it is undisputed that Simon Wrecking transported waste to the Site for treatment or disposal and there was a release of hazardous substances from the Site, and because the

---

[19] Simon Wrecking's defense that it cannot be liable as a transporter because of its common carrier status is without merit.  There is no common carrier defense included in the enumerated categorical defenses to liability in 42 U.S.C. § 9607(b).  See e.g. FMC Corp. v. U.S. Dept. of Commerce, 29 F.3d 833, 841 (3d Cir. 1994) ("§ 9607(b) lists the only three defenses to section 107 liability available to any person"); U.S. v. Atlas Minerals and Chemicals, Inc., 797 F. Supp. 411, 415-16 (E.D. Pa. 1992) (listing 15 reported decisions where courts have held that liability under § 107(a) of CERCLA is subject only to the defenses listed in § 107(b)); Town of Munster, Ind. v. Sherwin-Williams Co., Inc., 27 F.3d 1268, 1273-74 (7th Cir. 1994).

evidence presented makes it more likely than not that Simon Wrecking had substantial input in selecting the Site at least some of the time, I find that Simon Wrecking is liable as a transporter under 42 U.S.C. § 9607(a)(4).[20]  In the allocation analysis below, however, I take into account the evidence that Simon Wrecking did not always choose the Site, and accordingly will reduce its drum count by 10%.


## III.    Costs to Be Allocated

The CSDG can only recover from the Simon Entities their allocable share of "necessary costs of response...consistent with the national contingency plan."  42 U.S.C. § 9607(a)(4)(B). The Simon Entities argue that the CSDG did not produce evidence that the costs it has incurred in remediating the Site are consistent with the national contingency plan ("NCP").  This argument is without merit.  The CSDG members are all parties to the Consent Decree, a settlement entered into pursuant to § 122 of CERCLA, 42 U.S.C. § 9622(a).  The regulations provide that "[a]ny response action carried out in compliance with the terms of...a consent decree entered into pursuant to section 122 of CERCLA, will be considered 'consistent with the NCP.'" 40 C.F.R. § 300.700(c)(3)(ii).  Therefore any costs the CSDG incurs in complying with the Consent Decree are considered consistent with the NCP and should be allocable in a CERCLA contribution action.  The total allocable costs consist of the CSDG's past Site-related expenses, the future estimated costs of the ROD-specified remedy, and the oversight costs that the EPA can recover from the CSDG.

---

[20] There is no reason to embark on the analysis for arranger liability after finding Simon Wrecking liable as a transporter.

a.     Past Costs Related to Site Remediation

First I will consider the costs that the CSDG has already incurred and whether those costs are recoverable under CERCLA.  Through November 30, 2005, the last date before trial that the CSDG calculated expenditures, it had spent $4,224,701 (other than attorneys fees[21]) in various costs related to the Site.  As summarized in my Finding of Fact No. 97, these expenditures were:

| | Description | Amount | Supporting Documentation/Evidence |
|---|---|---|---|
| a | de maximis, inc., supervising contractor | $547,872 | Pls.' Zelov Ex. 4 |
| b | Golder Associates, contractor | $1,469,074 | Pls.' Zelov Ex. 4 |
| c | Philadelphia Suburban Water Company, for connecting Hillbrook circle neighborhood to public water supply | $350,150 | Pls.' Zelov Ex. 3 |
| d | ERM, for connecting the Hillbrook Circle neighborhood to a public water supply | $360,612 | Pls.' Zelov Ex. 3 |
| e | Connecting an additional property to a public water supply | $3,295 | Pls.' Zelov Ex. 3 |
| f | East Whiteland Township, for resurfacing the road after construction of the water line | $19,663 | Pls.' Zelov Ex. 3 |
| g | O'Brien & Gere, contractor constructing the remedy at the site | $1,401,882 | Pls.' Zelov Ex. 4 |

_____

[21] The Supreme Court has held that CERCLA § 107 does not allow the recovery of private litigants' attorney's fees.  Key Tronic Corp. v. U.S., 511 U.S. 809, 819 (1994).

| h | Reimbursement of Commonwealth of Pennsylvania's response costs[22] | $60,461 | Pls.' Zelov Ex. 4 |
|---|---|---|---|
| i | Nihill & Riedley, for investigative forensic accounting in 1998 and 1999 (*Not recoverable as a response cost.*) | ($9,616) | Pls.' Zelov Ex. 4 |
| j | National Fraud Center, for identifying and investigating potential PRPs and their financial condition (*Not recoverable as a response cost.*) | ($35,749) | Pls.' Zelov Ex. 4 |
| k | Shaw Environmental, for a study of the potential effectiveness of accelerated bioremediation | $11,692 | Pls.' Zelov Ex. 4 |
| l | **Total allocable past response costs** | **$4,224,701** | |

As noted in the chart, these expenses can all be characterized as necessary response costs consistent with the NCP except for the amounts spent on investigative forensic accounting and on identifying and investigating potential PRPs and their financial condition. These two expenses add up to $13,195. These expenses were incurred to determine the responsibility of other PRPs and to recover money from them, rather than to investigate or remediate the Site. As such, they were not required by the Consent Decree and are not consistent with the NCP. Like attorney's fees, which are not recoverable under CERCLA, these expenses were incurred in collecting contribution from other PRPs to fund the cleanup of the Site. Therefore the $13,195 that the CSDG spent on Nihill & Riedley and the National Fraud Center is not recoverable in this suit.

The Simon Entities also argue that the CSDG's expenditures exploring bioremediation

---

[22] The CSDG is required by the terms of the Consent Decree to reimburse the Commonwealth of Pennsylvania's response costs regarding the Site. (Tr. 1/4/06 at 172 (S. Zelov); Pls.' Zelov Ex. 1, at 62, 64.)

are inconsistent with the NCP.  I find that they are consistent.  Bioremediation is a potentially less expensive method of using bacteria to eliminate the toxins in the groundwater that the CSDG had hoped could replace "pump and treat" as the MPA remedy component.  The CSDG spent money on testing bioremediation with the EPA's permission.  Earlier, and as a direct result of other CSDG experimentation and research, the EPA amended the ROD to include the cheaper SVE remedy for the FDA soils.  The EPA ultimately did not approve bioremediation to replace the "pump and treat" method, but the CSDG's research in this area was also carried out in the hopes of amending the ROD for a more effective and cost-efficient method of cleanup.  In Caldwell Trucking PRP v. Rexon Tech. Corp., 421 F.3d 234, 246 (3d Cir. 2005), the Third Circuit rejected a defendant's argument that installation of an iron reactive barrier was inconsistent with the NCP because it was an "experimental remedy" not called for in the ROD.  As in Caldwell Trucking, the EPA has consented to all the work performed at the Site and has never objected to any of the work performed at the Site by the CSDG.  See id.  Therefore, like the cost of the iron reactive barrier in Caldwell Trucking, the CSDG's expenditure of costs associated with bioremediation experimentation is consistent with the Consent Decree, whether or not the EPA ultimately adopts bioremediation.

Including all the expenditures in the chart above except payments to Nihill & Riedley and the National Fraud Center, the amount of past costs eligible for allocation is $4,224,701.  This amount includes $1,401,882 in payments to O'Brien & Gere for partial construction of the ROD-required remedy.  Because the entire O'Brien & Gere contract is included in both parties' estimates of future costs of implementing the ROD-specified remedy, I will offset the future

costs to be expected at the Site, calculated in the next section, by the $1,401,882 already paid.[23]

b.     Future Costs of Implementing the ROD-Specified Remedy

_____To determine future costs of Site remediation, it is necessary to decide what remedy will be used at the Site.  Currently, the ROD requires the CSDG to perform a "pump and treat" remedy for the MPA groundwater.  The Simon Entities argue that I should base my estimate on an assumption that the EPA will amend the ROD to replace "pump and treat" with bioremediation.  I cannot estimate future costs based on a bioremediation remedy that has not been approved yet by the EPA.  The Consent Decree requires the CSDG to remediate the Site to the specifications in the ROD.  Thus in estimating the future costs of remediating the Site, I must estimate the future costs of the ROD-specified remedy.[24]

Both the CSDG and the Simon Entities presented expert testimony on how much the CSDG will have to spend to implement the ROD-specified remedy.  Smith testified for the CSDG, and Perry testified for the Simon Entities.  Their estimates for most components of the remedy were not significantly different, with two exceptions.   First, Smith's estimate of the "pump and treat" system for MPA groundwater was $12,425,081, more than twice as much as

---

[23] Both the CSDG and the Simon Entities included the work performed by O'Brien & Gere in their total estimates of future costs of Site remediation.

[24] The remedies chosen by the EPA in the ROD are subject to judicial review only under the well-established "arbitrary and capricious standard."  ELF Atochem North America, Inc. v. United States, 882 F. Supp. 1499, 1501 (E.D. Pa. 1995) (citing, e.g. U.S. v. Akzo Coatings of America, Inc., 949 F.2d 1409, 1424 (6th Cir. 1991); U.S. v. Northeastern Pharmaceutical & Chem. Co., 810 F.2d 726, 248 (8th Cir. 1986)); United States v. Nicolet, Inc., 1987 U.S. Dist. LEXIS 5139 (E.D. Pa. May 12, 1987) (J. Broderick).  There was no evidence presented in the trial of this case showing the ROD-selected remedies to be arbitrary or capricious.

Perry's estimate of $6,015,751.  I found Perry's estimate to be too low, because it was based on the use of on-site carbon regeneration, and he did not have the experience or scientific backing to persuade me that such technology would be feasible or cost-effective at the Site.  Although Smith's estimate is higher than the ROD estimate, I found his estimate most credible because it was based on the actual O'Brien & Gere construction bid, and took into account information discovered in the Pre-Design Investigation, which found greater contamination than originally estimated, leading to higher operation and maintenance costs.

The second difference between the two estimates is whether they included the costs of monitoring the attenuation of the MPA groundwater.  Smith included $1,176,509 for monitoring the attenuation of the MPA groundwater, while Perry omitted it completely, admitting at trial that he thought it had been accounted for elsewhere.  Monitoring the MPA groundwater is included in the 1997 ROD, and therefore I will include Smith's estimate for it in my estimate of total remedy cost.

Overall I choose to adopt Smith's estimates for future costs because he has greater experience with this kind of site remediation, and his cost estimates are based on the actual O'Brien & Gere competitive bid for the contracting work.  Those costs are itemized and added up in my Finding of Fact No. 102, and amount to $17,872,964.

c.      EPA's Recoverable Oversight Costs[25]

---

[25] As previously noted, two months after trial, the EPA filed suit against Simon Wrecking and Simon Resources, seeking payment of response costs incurred by the United States at the Site.  (U.S. v. Simon Wrecking, Inc. and Simon Resources, Inc., Civ. Action No. 06-CV-928, E.D. Pa.)  The complaint does not specify the amount of costs the EPA is seeking, and nothing else has yet been filed in the case.  It is impossible at this point to speculate what effect, if any,

In addition to the direct costs of remediation, the CSDG is liable to the EPA for its oversight costs at the Site.  The Consent Decree requires the CSDG to reimburse the EPA for oversight costs at the Site "if the decision in United States v. Rohm & Haas Co., [2 F.3d 1265 (3d Cir. 1993)] regarding the liability of responsible parties under Section 107(a)(4)(A) of CERCLA for EPA oversight costs is reversed or overturned by the Court of Appeals for the Third Circuit, the United States Supreme Court, or the United States Congress."  (Pls.' Zelov Ex. 1, pp. 64-65.)   Less than a month before trial in this case, the Third Circuit overruled Rohm & Haas, holding that the EPA can recover oversight costs incurred during hazardous waste cleanup conducted by PRPs under CERCLA § 107.  See United States v. E.I. DuPont de Nemours, 432 F.3d 161 (3d Cir. 2005).  Therefore the CSDG is liable to the EPA for past and future costs of overseeing the remediation of the Site.

The EPA has incurred oversight costs supervising the CSDG's remediation of the Site, and will continue to incur costs over the duration of the cleanup.  Leo Mullin, cost recovery expert at the EPA, testified that oversight costs at the Site over the next thirty years are likely to be about $1 million in present value.  Because the CSDG incurred this cost pursuant to the Consent Decree, it is presumed consistent with the NCP.  Therefore the estimated $1 million amount is also allocable in this contribution action as a necessary response cost consistent with the NCP.

d.    Total Estimated Cost of Site Remediation to be Allocated

The total cost of cleanup to be allocated in this suit is the sum of the allocable past costs

_____

the outcome of that case could have on the allocation of EPA oversight costs in this case.

59

incurred by the CSDG, the future site remediation costs, and the EPA oversight costs.  The sum

of these amounts is $23,097,665, as shown in the following chart:

| Cost Category | Amount |
|---|---|
| Allocable past costs | $4,224,701 |
| Future costs of implementing the ROD-specified remedy | + $17,872,964 |
| Costs that EPA can recover from the CSDG | + $1,000,000 |
| **Total allocable costs consistent with the NCP** | **= $23,097,665** |

## IV.    Equitable Allocation of Response Costs

The allocation of response costs in a § 113 contribution case is governed by CERCLA's

broad instruction that the court "may allocate response costs among liable parties using such

equitable factors as the court determines are appropriate."  42 U.S.C. § 9613(f)(1).  The Third

Circuit and others have noted that the language of § 9613(f)(1) demonstrates Congress's intent

that trial courts exercise their discretion in determining what factors to consider.  Beazer East,

Inc. v. Mead Corp., 412 F.3d 429, 446 (3d Cir. 2005) (citing Envtl. Trans. Sys., Inc. v. ENSCO,

969 F.2d 503, 508 (7th Cir. 1992); U.S. v. R.W. Meyer, Inc., 932 F.2d 568, 576-77 (6th Cir.

1991)).  The Third Circuit has also held that "a court may consider several factors or a few,

depending on the totality of the circumstances."  Id. (citing New Jersey Turnpike Auth. v. PPG

Indus., Inc., 197 F.3d 96, 104 (3d Cir. 1999)).

The first step in allocating the total response costs is to account for the shares of PRPs

that have settled their liability with the EPA and the CSDG.  Second, the "orphan share"

attributable to unknown or insolvent PRPs must be allocated.  Third, the relative liability of the

CSDG and the Simon Entities based on their barrels of waste will dictate Simon's preliminary

share of the remaining response costs.  Finally, I consider the CSDG's arguments for a

recalcitrance penalty against the Simon Entities, for an uncertainty multiplier based on higher

than expected future costs, and for prejudgment interest.


a.     <u>Accounting for Settled Shares of Other PRPs</u>

All PRPs other than the Simon Entities have resolved their liability at the Site by settling

with the EPA or the CSDG, and are thereby protected from further contribution liability to the

CSDG.  It is necessary to decide whether and how these prior settlements affect the allocation of

costs between the CSDG and the Simon Entities.  The CSDG urges me to use a <u>pro tanto</u> method

of allocation, that is, to reduce the total to be allocated between the CSDG and the Simon Entities

by the *dollar amount* of the CSDG's settlements with other defendants.  The Simon Entities

argue that fairness requires a <u>pro rata</u> allocation, which would reduce the amount to be allocated

by the *proportionate share of fault* attributed to parties that have already settled with the

CSDG.[26]  For the reasons that follow, the <u>pro tanto</u> approach is most appropriate in the present

case.

The statute itself is silent on how to account for settlements in private PRP contribution

suits, but mandates the <u>pro tanto</u> approach in government-initiated actions.  When a party settles

with the United States or a state, such settlement "does not discharge any of the other potentially

---

[26] The <u>pro tanto</u> approach is the approach of the Uniform Contribution Among Tortfeasors Act ("UCATA").  <u>See</u> UCATA § 4.  The Uniform Comparative Fault Act ("UCFA") espouses the <u>pro rata</u> method.  <u>See</u> UCFA § 6.

liable persons unless its terms so provide, but it reduces the potential liability of the others *by the amount of the settlement*." Id. § 9613(f)(2) (emphasis added).  In contrast, no method of allocating settlements is specified for private PRP actions such as the one before me, beyond directing the court to "allocate response costs among liable parties using such equitable factors as the court determines are appropriate."  42 U.S.C. § 9613(f)(1).  The use of the pro tanto method in accounting for settlements in government-initiated suits demonstrates that it is at least a reasonable manner of allocating CERCLA liability.  The broad discretion granted courts in § 113 allocations allows courts to decide whether to use the pro tanto approach or another, depending on the equitable considerations.

In general, the pro tanto approach, by placing the risk of lenient settlements on PRP hold-outs such as Simon Wrecking, facilitates CERCLA's goal of encouraging early settlement and private remediation.[27]  In a pro rata regime, PRPs such as the CSDG who assume responsibility for cleanup by signing consent decrees with the EPA will have no flexibility to negotiate in settlements.  If they accept anything less from a PRP than what a court later determines to have been that PRP's proportionate share, they will have to pay for the difference out of their own pockets.  Further, the defendant PRPs will have no incentive to settle early on, because the early settlements of other PRPs will have no effect on the potential liability of remaining PRPs.  In such a regime, it would be more difficult to settle with contribution defendants.  As a result, contribution plaintiffs would be forced to litigate against more PRPs, spending non-recoverable

---

[27] For a persuasive argument that the UCATA is superior to the UCFA in encouraging settlements, and therefore voluntary private cleanup in CERCLA cases, see Joseph A. Fischer, All CERCLA Plaintiffs Are Not Created Equal: Private Parties, Settlements, and the UCATA, 30 Hous. L. Rev. 1979 (1994).

attorneys fees.  Such a prospect would make it less likely that PRPs would be willing to sign consent decrees with EPA and voluntarily undertake remediation of polluted sites.

In contrast, under a pro tanto regime, contribution plaintiffs will have more flexibility in settling with defendant PRPs, because any potential shortfalls of early settlements can be shared by the contribution plaintiffs and non-settling PRPs in an equitable allocation at trial.  In a pro tanto scheme, there is incentive for contribution defendants to settle early, because if they wait to settle and force plaintiff PRPs to litigate against them, they would likely face increased liability as a result of the favorable settlements of other PRPs.  If it is easier for PRP groups to recover costs by settling early with other PRPs, they are more likely to come forward to settle with the EPA and take on the task of remediating contaminated sites, furthering CERLCA's goals of private party remediation and early settlement.

The pro tanto approach also has several advantages in this case specifically.  First, it is better to compare the relative shares of parties with the opportunity to present evidence at trial. In this case, only the Simon Entities remained as viable defendants at trial, and the record was not adequately developed as to the liability of all the parties that settled with the CSDG before trial.  The pro tanto method makes it possible to account for the settlements of PRPs not before the court, without having to determine their proportionate shares according to fault.  Second, a good faith hearing is not required in this case to determine the fairness of the settlements.  The de minimis settlements were based on the volumetric shares of the de minimis PRPs and the overall costs of cleanup calculated at the time, and there is no evidence in the record to indicate that the settlements the CSDG reached with the other parties, including Chemclene, were not negotiated in good faith.  Therefore the settlement amounts presumably will not grossly underestimate the

settling PRPs' liability.  Finally, the <u>pro</u> <u>tanto</u> approach avoids having to determine the "orphan share," which would be impossible to determine in this case because there is no documentation for pre-1968 drums sent to the Site.  Instead, the orphan share can be lumped in with the unrecovered costs to be allocated proportionately between the CSDG and the Simon Entities in proportion to their relative liabilities, as explained in the next subsection.

The Third Circuit has not yet addressed the question of how to account for prior settlements in a § 113 contribution action.[28]  The two courts of appeals to have considered this issue both found the <u>pro</u> <u>tanto</u> approach of the UCATA appropriate.  The Seventh Circuit chose to extend the mandatory <u>pro</u> <u>tanto</u> approach of § 113(f)(2) to claims under § 113(f)(1), to promote consistency within the statute and "to avoid what could be a complex and unproductive inquiry into the responsibility of missing parties."  <u>Akzo Nobel Coatings, Inc. v. Aigner Corp.</u>, 197 F.3d 302, 307-08 (7th Cir. 1999).  Most recently, the First Circuit upheld a district court's use of the <u>pro</u> <u>tanto</u> approach after discussing the benefits and drawbacks of each method.   The First Circuit noted that the <u>pro</u> <u>rata</u> approach requires a potentially "complex and unproductive

---

[28]The only case in the Third Circuit addressing the allocation of prior settlements in a CERCLA contribution action is from a district court, and it does not provide strong support for either position.  In <u>United States v. Atlas Minerals and Chemicals, Inc.</u>, 1995 WL 510304 (E.D. Pa. Aug. 22, 1995) (C.J. Cahn), the parties agreed that earlier settlements were representative of the settling parties' shares.  The court stated that it was adopting the UCFA approach, but decided to "treat the settlement values as representative of the settled parties' equitable shares and...reduce the Third-Party Defendants' liability accordingly." <u>Id.</u> at *83.  The court noted that under the UCFA, the plaintiff PRPs bore the risk that settling PRPs' actual proportionate shares may be greater than their settlement amounts, which would give them an incentive to settle for as close to the settling PRPs' proportionate shares as possible. <u>Id.</u> at *82.  Unlike in <u>Atlas Minerals</u>, parties in the present case do not agree that the settlement amounts represent actual proportional shares, so I must decide between the two methods.  Because I disagree with the determination that plaintiff PRPs must bear the risk of any settlement shortfalls, and find it likely that a UCFA approach would discourage early settlement, I do not find the reasoning of <u>Atlas Minerals</u> persuasive.

inquiry" into the liability of all the firms that have settled, but may ensure an equitable apportionment of damages, while the pro tanto approach may mean that a litigating defendant's liability will differ from its equitable share, but is "easier to administer" and is the approach required by CERCLA when a PRP settles with the United States.  American Cyanamid Co. et al. v. Capuano et al., 381 F.3d 6, 19-21 (1st Cir. 2004).  Therefore it is within a trial court's discretion to use the pro tanto approach.[29]

I agree with the First and Seventh Circuits that accounting for the shares of settled parties using the pro tanto method is a permissible exercise of discretion, and find that it is preferable in the present case.  Therefore the Site costs to be allocated between the CSDG and the Simon Entities will be reduced by the amounts of settlements the CSDG has received or expects from settled PRPs.  All the settlement amounts are known except the amount that the CSDG will receive from its contingent settlement agreement with Chemclene, which I shall represent with the variable X.  The other settlements provide the CSDG with $6,630,670.  (See Finding of Fact No. 152.)  Thus the total amount of settlements with other PRPs equals ($6,630,670 + X).  Subtracting this amount from the total expected cost of cleanup previously calculated, $23,097,665, yields the amount to be allocated, as follows:

$$\$23{,}097{,}665 - (\$6{,}630{,}670 + X) = (\$16{,}466{,}995 - X)$$

Therefore I will allocate the remaining ($16,466,995 - X) between the CSDG and Simon

---

[29] The court noted that "The different approaches to accounting for settling parties can produce different results and, for uniformity purposes, it may be wise to choose one of these two approaches," but declined to choose one.  Id. at 21.

Wrecking.[30]

b.    The Orphan Share

The share of waste from unidentifiable sources or insolvent PRPs is known as the

"orphan share" at a CERCLA site.  In this case, although the Site was in operation since the

1950s, there is no documentation of the origin of any waste sent to the Site before 1968.  Some of

the documentation of waste drop-offs that does exist links post-1968 waste to unidentifiable,

insolvent, or defunct companies.  The Site's orphan share is included in the remaining amount to

be allocated ($16,466,995 - X) because the CSDG has not received any settlements to cover it.

The Simon Entities argue that they should not be liable for any part of the orphan share.  I

disagree.  Given the facts of this case, it is equitable to allocate the orphan share proportionally

between the CSDG and the only remaining defendants.

Both the statute's language and goals support this decision.  I concur with the court in

United States v. Kramer, 953 F. Supp. 592 (D.N.J. 1997) that "to hold that third-party defendants

in a CERCLA case may never be held responsible for an orphan share would essentially engraft

on to the CERCLA statute a restriction that finds no basis in the statutory language or legislative

history."  Id. at  598.   It is undisputed that CERCLA gives federal courts broad discretion in the

equitable apportionment of liability under § 113(f)(1).  Nowhere in the statute is there a

proscription against allocating part of an unrecoverable share to contribution action defendants as

well as to PRP plaintiffs.  As noted in Kramer, the instruction in § 113(f)(1) "to allocate response

───────────────────

[30] A hearing on the value of the CSDG's settlement with Chemclene will provide the
basis for calculating the exact amount of costs to be allocated, and the Simon Entities' share.

66

costs 'among liable parties' logically means among all liable parties, whether defendants or third-party defendants, without limitation to some subset of liable parties." Id. at 598. PRPs will be unlikely to fulfill the goals of CERCLA by settling early on and undertaking remediation of waste sites with an orphan share if they are unable to recover equitable contribution for the orphan share from other viable PRPs, and must instead add the entire amount to their own shares.

The Third Circuit has not addressed the issue of orphan share allocation in a CERCLA contribution action,[31] but all the other federal courts of appeals to consider the issue have concluded or assumed that the orphan shares should be allocated equitably among plaintiff and defendant PRPs. See, e.g., Morrison Enter. v. McShares, Inc., 302 F.3d 1127, 1135 (10th Cir. 2002) (orphan shares "should be equitably divided among the plaintiffs and other defendant PRPs"); Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp., 153 F.3d 344, 354 (6th Cir. 1998) (in a contribution suit "the district court, pursuant to its § 113(f) authority may apportion the amount of the orphan shares among the parties"); Pinal Creek Group v. Newmont Min. Corp., 118 F.3d 1298, 1303 (9th Cir. 1997) ("Under § 113(f)(1), the cost of orphan shares is distributed equitably among all PRPs"). I agree with these courts that the allocation of the

---

[31] The case relied on by the Simon Entities does not persuade me to allocate the orphan share entirely to the CSDG. The Simon entities cite Gould v. A & M Battery and Tire Service, Inc. et al., 901 F. Supp. 906 (M.D. Pa. 1995), for the proposition that "it would be most inequitable to hold Defendants liable for any of the 'orphan shares' when [the site's] waste-in-list specifically indicates the exact amount each Defendant contributed to the harm." Id. at 913. Even in Gould, the trial court did not hold that allocating the orphan share among both contribution plaintiffs and defendants is not permitted under §113(f). Gould represents a determination that the equitable factors present in one case pointed away from allocating any of the orphan share to the contribution defendants. Perhaps in that case, better records existed. In the case before me, there is not even evidence of the size of the orphan share, because no records exist prior to 1968, and it would seem most inequitable to place that entire share on the PRPs who have settled with the EPA and have undertaken the remediation of the Site.

orphan share is within my discretion.  There is no reason that the CSDG, having undertaken

remediation of the Site, should bear all the responsibility for unrecoverable shares.  Therefore it

is equitable to divide the orphan share between the CSDG and Simon Entities.

Because the size of the orphan share is indeterminate, the fairest way to divide it is not to

estimate what part of the remaining costs constitutes the orphan share and divide it separately,

but instead to allocate the entire $(16,466,995 - X) between the CSDG and the Simon Entities, in

proportion to their relative liability at the Site, as determined below.


c.      Allocation Between the CSDG and Simon Wrecking

To allocate the remaining ($16,466,995 - X) in Site costs, I must assess the relative

responsibility of the CSDG and the Simon Entities, again "using such equitable factors as the

court determines are appropriate."  42 U.S.C. § 9613(f)(1).  An unsuccessful CERCLA

amendment proposed by then-Representative Al Gore (referred to since as the "Gore Factors") is

often cited[32] as a non-exclusive list of appropriate considerations:

> (i) the ability of the parties to demonstrate that their contribution to a discharge, release or
> disposal of a hazardous waste can be distinguished;
> (ii) the amount of the hazardous waste involved;
> (iii) the degree of toxicity of the hazardous waste involved;
> (iv) the degree of involvement by the parties in the generation, transportation, treatment,
> storage, or disposal of the hazardous waste;
> (v) the degree of care exercised by the parties with respect to the hazardous waste
> concerned, taking into account the characteristics of such waste; and

---

[32] Cases in the Third Circuit alone citing the Gore Factors for guidance in CERCLA
allocations include Lenox Inc. v. Reuben Smith Rubbish Removal, 91 F. Supp. 2d 743, 747
(D.N.J. 2000); U.S. v. Pesses, 120 F. Supp. 2d 503, 506 (W.D. Pa. 2000); U.S. v. Compaction
Sys., 88 F. Supp. 2d 339, 355 (D.N.J. 1999); Gould, Inc. v. A & M Battery & Tire Serv., 987 F.
Supp. 353, 362-64, 368-72 (M.D. Pa. 1997); U.S. v. Kramer, 953 F. Supp. 592, 598 (D.N.J.
1997).

(vi) the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment.

126 Cong. Rec. 26,779-81 (1980).  While this list is not binding because the Gore Amendment was never passed, it provides some helpful guidance.  The evidence presented at trial focused mostly on three of these factors: the amount of hazardous waste involved; "the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste"; and the degree of cooperation with federal officials.[33]  I consider the amount of hazardous waste provided by each party and its involvement with the Site to be important, and do not find cooperation or recalcitrance to be a useful factor for allocation in this case.

i.      The Parties' Volumetric Shares

Both the CSDG and the Simon Entities presented evidence and expert testimony as to the parties' relative volumetric shares, which is the proportion of barrels of waste each party is responsible for out of the total attributable to both the CSDG and the Simon Entities.  The CSDG introduced and authenticated each document related to waste transported by Simon Wrecking to Chemclene.  The CSDG's expert Dovell also included a database of each transaction involving members of the CSDG and Simon Wrecking, based on the EPA's Comprehensive Transaction Report, and taking into account more recently discovered documents.  Based on his extensive

---

[33] The other Gore factors are not useful in allocating costs in this case. The parties' contribution to the Site's contamination cannot be distinguished beyond the amount of waste that they introduced.  There was no evidence presented on the degree of toxicity of the waste, beyond establishing that Simon Wrecking transported TCA and TCE, the primary contaminants necessitating the Site remediation.  Finally, there was little evidence of Simon Wrecking's degree of care (only the letter from Lloyd Balderston certifying compliance with environmental laws and regulations), and no evidence of the degree of care exercised by the CSDG members.

documentation of the CSDG drum count, and the rational methods he employed in counting

drums, as explained at trial, I adopt his calculation of 13,190.51 drums for the CSDG.[34]

For the Simon Entities, I count the transactions as detailed in the chart at Finding of Fact

No. 41, applying a few consistent principles.  First, I do not count the quantities that the CSDG's

expert Dovell did not count in his allocation for Simon Wrecking.  As plaintiffs' expert, he

examined both parties' transactional documents and did not count those he determined to be

duplicative of other receipts or related to non-hazardous waste.  Second, unlike Dovell, I assign

Simon Wrecking only half of the drums it transported from Letterkenny Army Depot, because

Letterkenny is a known PRP and the CSDG has already settled with the Department of the Army

for those drums.  I assign Simon Wrecking the full amount of drums it transported from

unknown generators because there is no evidence that those parties had a relationship with

Chemclene, and no expectation that those parties will contribute to the cost of remediating the

Site.  Finally, I follow Dovell's general principle of not assigning any drums for volumes noted

in internal production-run documents, but unlike him, apply it uniformly, because there is no

reason to believe that any of those drums were not accounted for in delivery or receiving records.

Following these principles, Simon Wrecking's preliminary share is 976.51 drums.

Simon's preliminary share must be reduced by 10% to account for the evidence regarding

the extent of Simon Wrecking's involvement in selecting the Site.  As discussed above, there was

sufficient evidence to conclude that Simon Wrecking had at least substantial participation in

---

[34] The Simon Entities' own expert Wittenbrink calculated fewer drums for the CSDG parties described in Ray Dovell's Expert Report: 12,922.9.  Because I found Dovell more experienced and credible, and there is no reason for him to overcount his client CSDG's drums, I accept Dovell's higher count.

selecting the Site for disposal at least some of the time, but not enough to conclude that it always did so.  The evidence indicated that at least once, waste generator Letterkenny consigned its waste directly to Chemclene, even though Simon Wrecking was to transport it.  A 10% reduction in the amount of waste credited to Simon Wrecking reflects this uncertainty about how often it was substantially involved in site selection, and results in an adjusted share for Simon Wrecking of 878.86 drums.

The combined adjusted shares of the CSDG and Simon Wrecking amount to 14,069.37 drums.  Of this total, the CSDG's 13,190.51 drums account for 93.75% and Simon Wrecking's 781.2 account for 6.25%.   Therefore Simon Wrecking's preliminary share of the remaining estimated site costs is 6.25 % x ($16,466,995 - X).[35]

ii.      Recalcitrance

I reject the CSDG's request to increase the Simon Entities' share based on their alleged non-cooperation, or recalcitrance, with the EPA and the CSDG.  The CSDG illustrates the appropriateness of a recalcitrance multiplier by citing to United States v. Consolidation Coal Co., 345 F.3d 409 (6th Cir. 2003).  I find this case unpersuasive.  The lone remaining defendant PRP in Consolidation Coal had declined to participate in the PRP investigation of that site, had violated county regulations in disposing of its waste, and did not cooperate at all with the state or federal EPA.  The facts in Consolidation Coal are quite dissimilar from those in this case.

The evidence at trial showed that Simon Wrecking attempted to cooperate with the major

---

[35] This figure, ($16,466,995 - X), represents the total Site costs less the amount of settlements expected or received from other PRPs, with the uncertain amount of the Chemclene settlement represented by the variable X.

PRPs and the EPA.  Simon Wrecking joined the Chemclene Site Study Group and paid its dues.

Indeed, Simon Wrecking was listed on the letterhead of the group's initial good faith offer to the

EPA to conduct the clean up of the Site.  Subsequently the CSDG unilaterally ejected Simon

Wrecking, in violation of its internal rules, allegedly afraid that Simon Wrecking would use any

consent decree as a shield against future lawsuits and then default on its obligations to the

CSDG.

It is unfair to penalize Simon Wrecking for the CSDG's speculations about what Simon

would do in the future.  Unlike the defendant PRP in Consolidated Coal, Simon Wrecking was

not unresponsive in this matter.  After Simon Wrecking's expulsion from the CSDG, David

Simon had repeated contact with the EPA.  He was unable to satisfy the rigorous document

production required for an "ability to pay" settlement, but Mullin of the EPA said that 90-95% of

companies that attempt to obtain such a settlement likewise fail the documentation requirements.

Simon had a genuine belief that he could not use the Trust set up to cover liability at fifteen other

sites to cover liability at the Chemclene Site, and that he would violate his agreements with

insurers by revealing details of the Trust.

Unlike the defendant PRP in Consolidation Coal, the Simon Entities attempted to resolve

their share of liability.  They initiated a lawsuit against their insurers to obtain coverage for its

liability at the Site.[36]  Simon Wrecking nevertheless attempted to settle with the CSDG, but was

met with a demand of almost $8 million, far more than any liability it faced going to trial, and

one third of the entire proposed site clean up costs.  Therefore I do not find the Simon Entities' to

---

[36] Simon Wrecking Co., Inc. et al. v. American International Underwriters et al., Civ.
Action No. 03-CV-3231, also before me.

have been recalcitrant, and their failure to settle with the CSDG before trial will not affect my

equitable allocation of costs.


d.    Uncertainty Multiplier

Adding an uncertainty premium to Simon's preliminary share is appropriate in this case

to account for the possibility that future costs could be higher than expected, and to maintain

parity with earlier settlements.  Testimony at trial established that the EPA charged a 50%

premium in its settlements with de minimis parties in this case to cover uncertainty in future

costs, and that it is likely that the costs of cleaning up the Site could be higher than expected.

Courts routinely approve uncertainty premiums when signing consent decrees in CERCLA cases,

to ensure that the parties assuming cleanup are not unduly burdened by unforeseen future costs,

and to acknowledge the benefit settling parties receive in resolving their liability early.  See, e.g.,

U.S. v. Borough of Lemoyne, 1994 U.S. Dist. LEXIS 21533, *23-24 (M.D. Pa. Nov. 17, 1994)

(C.J. Rambo) (approving 150% premium on future costs in de minimis settlements); U.S. v.

Cannons Eng'g Corp., 720 F. Supp. 1027 (D. Mass. 1989) (approving 60% premium in de

minimis settlements "to cover unexpected costs or unknown conditions found at the sites").  The

rationales behind charging an uncertainty premium in voluntary settlements apply with equal

force in an equitable allocation.

Evidence at trial indicated that costs may be higher than originally anticipated at the time

of the Consent Decree.  In the summer of 2005, additional drums were found at the MPA,

causing the CSDG to extend the MPA cap to cover the area.  In September 2005, the EPA's five-

year review prompted the EPA to ask the CSDG to study vapor intrusion and 1,4 dioxane at the

Site, two hazards that were not associated with the Site at the time the CSDG signed the Consent

Decree.  The EPA may force the CSDG to incur additional costs to remedy vapor intrusion or 1,4

dioxane contamination at the Site, even though any work that the CSDG does regarding these

hazards would be in addition to the remedial action required by the original ROD.  The O'Brien

& Gere estimated costs have already risen once, an example of the potential for construction cost

overruns.

Additional cost variables are still unknown.  The contaminant plume is not completely

delineated yet, and so the cost of remediating it is still uncertain.  Also, the costs are only

projected for thirty years because that is as far as the EPA will predict.  From the evidence at

trial, it appears that cleaning up the site completely could take more than thirty years, adding

significantly to the operation and maintenance components of the remedies.

Charging an uncertainty premium on a CERCLA defendant's preliminary share

acknowledges the benefit that parties receive by resolving their liability long before the cleanup

is completed.  The CSDG, by agreeing with the EPA to remediate the Site, has assumed the risk

that it may have to spend far more than expected before its responsibility has been fulfilled.

Recognizing the benefits of a final settlement early on in a lengthy clean up process, the EPA

charged de minimis PRPs an uncertainty premium of 50% to adjust for potential cost overruns in

each of the three rounds of de minimis settlements in this case.  Satisfaction of judgment in this

case will likewise resolve the Simon Entities' liability at the Site, while the CSDG shoulders the

uncertainty of costs in the years ahead.  Therefore I will apply the same 50% premium for

uncertainty to the Simon Entities' preliminary share.  A 50% uncertainty premium for Simon

would be 50% x [6.25% x ($16,466,995 - X)], or 3.13% x ($16,466,995 - X).  The Simon

Entities' equitable share including the uncertainty premium is thus 150% x [6.25% x

($16,466,995 - X)], which equals **9.38% x ($16,466,995 - X)**.


e.    Prejudgment Interest

An award of prejudgment interest is authorized under both CERCLA and the HSCA.

CERCLA section 9607(a)(4)(D) provides in part that

The amounts recoverable in an action under this section shall include interest on the
amounts recoverable under subparagraphs (A) through (D).  Such interest shall accrue
from the later of (i) the date payment of a specified amount is demanded in writing, or (ii)
the date of the expenditure concerned.

42 U.S.C. § 9607(a)(4)(D).[37]

On April 12, 2001, the CSDG demanded that Simon Wrecking pay $7,997,102.65 to

settle its liability at the Site.  The CSDG argues that it should be awarded prejudgment interest on

all response costs accruing from the later of the April 12, 2001 demand letter or the date the

expenditure occurred.  Because the demand was unreasonably high and because the CSDG has

recovered more in settlements than it has spent on response costs to date, I do not award the

CSDG prejudgment interest.

The award of prejudgment interest is discretionary.  In <u>Caldwell Trucking PRP v. Rexon</u>

_____

[37] The language of the relevant HSCA provision is almost identical.  HSCA section
702(b) provides that
(1) the amounts recoverable in an action under sections 507 and 1101 include interest on
the amounts recoverable under subsection (a).  Interest shall accrue from the later of:
(i) the date payment of a specified amount is demanded in writing; or
(ii) the date of the expenditure concerned...
35 P.S. § 6020.702(b).  Only one reported decision has awarded prejudgment interest under this
provision, and it was in a direct suit by the Pennsylvania Department of Environmental
Resources.  <u>See</u> <u>Comm. of Pa. v. Bryner</u>, 636 A.2d 227 (Pa. Commw. Ct. 1993).

Technology Corp., 421 F.3d 234 (3d Cir. 2005), the Third Circuit held that "prejudgment interest may be awarded under section 113, although it is not mandatory." Id. at 247.  The equitable considerations that could justify an award of prejudgment interest against a recalcitrant PRP are largely absent in this case.  The CSDG's demand of Simon Wrecking in its April 12 letter was roughly a third of the projected total cost of remediating the entire Site.  However, even by the CSDG's estimate, Simon Wrecking was only responsible for less than 4%, or 1,136.01 drums of waste out of a total of almost 30,000 documented in the EPA's CTR.  Thus, the April 12, 2001 demand was so unreasonable that it would not be fair to penalize Simon Wrecking for not settling its liability at the point it received the letter.  Although the CSDG was forced to litigate this case to trial to recover from the Simon Entities, those attorneys' fees are not recoverable in this case, and as discussed above, the Simon Entities' alleged recalcitrance does not justify imposing interest as a penalty for not settling.

Prejudgment interest in this case is also not justified by a need to give restitution to a plaintiff who has been unreasonably burdened.[38]  According to the Third Circuit, the rationale for awarding prejudgment interest in a CERCLA case is that "when a plaintiff has been denied the use of an ascertainable amount of money for a period of time, there is an actual loss." Caldwell Trucking PRP, 421 F.3d at 247.  In this case, although the CSDG has incurred significant liability by signing the Consent Decree with the EPA and has paid several million dollars in response costs from its account, it has recovered more than that amount from other PRPs, so that

_____

[38] The major burden imposed by the Simon Entities' refusal or inability to settle with the CSDG was the cost of attorneys' fees to litigate the case to trial, which are not recoverable under CERCLA and the HSCA.  See Key Tronic Corp. v. U.S., 511 U.S. 809, 819 (1994); In re Joshua Hill, Inc., 294 F.3d 482, 491 (3d Cir. 2002) (predicting that the Pennsylvania Supreme Court would hold that attorneys fees are not recoverable in a private party HSCA suit).

the CSDG members have not yet had to use their own money for response costs. Because the

CSDG's demand was unreasonable and its loss, if any, in not being able to use the Simon

Entities' money earlier was negligible, the CSDG is not entitled to prejudgment interest on its

CERCLA claim.

**V.      The Successor Liability of Simon Resources and Mid-State Trading**

Simon Resources and Mid-State Trading were not directly involved with the Site, and can

only be liable in this suit if they are successors to Simon Wrecking's liability at the Site. In

Smith Land & Imp. Corp. v. Celotex Corp., 851 F.2d 86 (3d Cir. 1988), the Third Circuit held

that CERCLA imposes successor liability according to uniform federal law drawn from "the

general doctrine of successor liability in operation in most states." Id. at 92. Under this uniform

law, an acquiring corporation is liable for the CERCLA liabilities of the company it acquires

where:

> (1) it assumes liability; (2) the transaction amounts to a consolidation or merger [the "de
> facto merger" exception]; (3) the transaction is fraudulent and intended to provide an
> escape from liability; or (4) the purchasing corporation is a mere continuation of the
> selling company.

U.S. v. Gen. Battery Corp., 423 F.3d 294, 305 (3d Cir. 2005) (quoting Polius v. Clark Equiat Co.,

802 F.2d 75, 78 (3d Cir. 1986). On the basis of Simon Resources' representations in earlier

litigation, as summarized in my Findings of Fact Nos. 161-66, I conclude that it is a successor to

Simon Wrecking's liability under the de facto merger exception.

There are four elements to the de facto merger exception. First, there must be "a

continuation of the enterprise of the seller corporation, so that there is a continuity of

management, personnel, physical location, assets, and general business operations." Gen. Battery

Corp., 423 F.3d at 305.  Second, there must be "a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock." Id. Third, a de facto merger requires that the seller corporation "ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible." Id.  Finally, in a de facto merger, "[t]he purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation." Id.  In an unrelated state court case, Simon Resources, which is owned by Samuel Simon, filed several documents that provide the factual basis for finding that all four factors are met and that a de facto merger between Simon Wrecking and Simon Resources occurred in the early 1980s.[39]  See Simon Resources Inc. et al. v. Simon Holdings Inc. et al., Civ. No. 86-02288 (Lycoming Cty. Court of Common Pleas) (the "Lycoming litigation").

A brief recap of my findings of fact on Simon Resource's successor liability will suffice to establish that a de facto merger occurred.  As Simon Resources asserted in the Lycoming litigation, some time between 1979 and 1981 Simon Resources acquired all the physical assets of Simon Wrecking except two parcels of land, and continued to operate the identical scrap metal business from the identical location using Simon Wrecking's former plant and equipment.

---

[39]As noted in my Finding of Fact No. 168, I found the facts as asserted by Simon Resources in the Lycoming litigation more probative than the testimony of David Simon, who was not personally involved with the transactions between the two companies.  Although David Simon testified at trial that Simon Resource's assertions in the Lycoming litigation were not true, he could not give a plausible explanation for why untrue assertions would have been made in that case.  Also, he did not have first-hand knowledge of the transactions between Simon Wrecking and Simon Resources because he was neither an employee nor officer of either company at the time.  Simon Resource's pleadings present a more coherent account of the relationship between it and Simon Wrecking, and were submitted by Samuel Simon, the president of both Simon Resources and Simon Wrecking, who was in a better position to know the facts of the relationship between the companies.

(Finding of Fact No. 162.)  According to Simon Resources' lawyer in the Lycoming litigation, Simon Resources acquired the common stock of Simon Wrecking in 1979.  (Finding of Fact No. 161.)  Simon Resources retained the same employees, management and ownership as Simon Wrecking.  (Finding of Fact No. 165).  These facts establish the continuity of enterprise and ownership required by the <u>de</u> <u>facto</u> merger test.

The continued formal existence of Simon Wrecking does not bar a finding that a <u>de</u> <u>facto</u> merger occurred.  According to documents filed by Simon Resources in the Lycoming litigation, around the time that Simon Resources was formed, Simon Wrecking ceased its business activity, transferred its physical assets to Simon Resources, and became an inactive corporation.  After 1981, Simon Resources existed only as a corporate shell wholly owned by Simon Resources.  (Finding of Fact No. 165.)  Simon Wrecking could not be formally dissolved as a corporation because of the outstanding contingent environmental liabilities asserted against it and the environmental lawsuits naming it as a defendant.  (Finding of Fact No. 166.)  As the Third Circuit held in <u>General Battery Corp.</u>, "'barren continuation' of the seller company does not bar application of the de facto merger doctrine."  <u>Gen. Battery Corp.</u>, 423 F.3d at 308.   Therefore Simon Wrecking's continued existence as a corporate shell does not preclude satisfaction of the <u>de</u> <u>facto</u> merger test.

Simon Resource's representations to the Internal Revenue Service ("IRS") further support my finding that a <u>de</u> <u>facto</u> merger occurred.  In a schedule to Simon Resource's 1981 corporate tax return, it reported to the IRS that Simon Wrecking had been merged into Simon Resources in a tax-free merger pursuant to § 368 of the federal Tax Code.  (Finding of Fact No. 164.)  Another district court considering <u>de</u> <u>facto</u> merger liability under CERCLA noted that an agreement

between two companies conditioned on receiving tax-free reorganization status under § 368 allowed the transaction to "receive the same beneficial tax treatment given de jure mergers." In re Acushnet River & New Bedford Harbor Proceedings, 712 F. Supp. 1010, 1018 (D. Mass. 1989). The court found that the acquiring company's "claim that it did not 'intend' a merger rings hollow," and held that a merger had occurred for purposes of successor liability. Id. The argument applies with even more force in this case, where the acquiring company, Simon Resources, both received the tax benefit of a merger and maintained in subsequent litigation that a merger had occurred.

Mid-State Trading, however, is not liable as a corporate successor to Simon Wrecking. The only evidence of successorship that the CSDG could produce at trial was that Mid-State Trading, Simon Resources, and Simon Wrecking all share the same principal location and the same post office box. These facts are insufficient to satisfy any test of successor liability under CERCLA. Therefore Simon Resources, but not Mid-State Trading, is liable as a successor to Simon Wrecking in this action.


**VI.    The Simon Entities' Counterclaims**

The Simon Entities make a counterclaim for contribution damages from plaintiffs La France Corporation, Hercules Inc., Hamilton Technologies, Inc., and ABB f/k/a Fisher and Porter. CERCLA § 113(f)(2) states that "[a]ny person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." 42 U.S.C. § 9613(f)(2). HSCA § 6020.705(c)(2) provides that "[a] person who has resolved its liability to the [DEP] in

80

an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement unless the terms of the settlement provide otherwise."  35 P.S. § 6020.705(c)(2).  Each of the plaintiffs in this suit are signatories to the Consent Decree with the EPA and the Pennsylvania DEP approved in United States v. Settling Defendants, Civ. Action No. 99-CV-4402 (E.D. Pa.) (J. Fullam).  The Consent Decree resolved their liability to the EPA and the DEP.  Therefore none of the plaintiffs are liable to the Simon Entities on their counterclaims for contribution.

**VII.   The CSDG's Claims Under the HSCA**

The Simon Entities' liability is no different or greater under the HSCA than it is under CERCLA.  The HSCA "is Pennsylvania's version of CERCLA and was in fact modeled after the federal statute."  Two Rivers Terminal, L.At v. Chevron USA, Inc., 96 F. Supp. 2d 432, 443 (E.D. Pa. 2000).  Like CERCLA, the HSCA authorizes private parties to seek contribution from PRPs, and the court is empowered to "enter judgment allocating liability among the liable parties" using "such equitable factors as it deems appropriate."[40]  35 P.S. § 6020.705(a), (b); see also In re Joshua Hill, Inc., 294 F.3d 482 (3d Cir. 2002).  Again echoing CERCLA, the HSCA defines a responsible transporter as one who "accepts hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person from which there is a release or a threatened release of a hazardous substance which causes the incurrence of

---

[40] Unlike CERCLA, the HSCA lists factors that "the trier of fact shall consider." 35 P.S. § 6020.705(b)(1-5).  These factors include the factors that I did in fact consider, and thus do not change my allocation analysis.

response costs."[41]  35 P.S. § 6020.701.  The HSCA defines recoverable costs as "reasonable and necessary or appropriate costs of response."  35 P.S. §6020.702(a)(3).  The Third Circuit has held that, as under CERCLA, litigation costs incurred in a private contribution action are not recoverable under the HSCA.  In re Joshua Hill, 294 F.3d 482 (3d Cir. 2002).

I have already found Simon Wrecking and Simon Resources liable to the CSDG as transporters under CERCLA, so it is unnecessary to decide if they would be liable as transporters under the HSCA.  I have also considered several equitable factors in arriving at an equitable allocation of response costs in this case under CERCLA.  An equitable analysis under the HSCA would not impose any greater liability on the Simon defendants, given the crucial similarities between the HSCA and CERCLA as applied to this case.  Also, as explained earlier in this opinion, the Simon Entities do not face additional liability under the HSCA for prejudgment interest, and the HSCA does not authorize them to bring counterclaims against CSDG members.  Therefore it is not necessary to conduct a separate analysis of the parties' claims under the HSCA, and I decline to do so.


## VIII.   The Appropriate Remedy

The appropriate remedy is to enter a monetary judgment against Simon Wrecking and Simon Resources based on the estimated total costs of remediation presented at trial.  The only unknown variable in calculating the amount of Simon Wrecking and Simon Resource's liability

---

[41] The analogous CERCLA provision states that a liable transporter is "any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance." 42 U.S.C. § 9607(a)(4).

is the amount the CSDG will receive from its settlement with Chemclene, which is contingent on

a future sale of property.  Earlier, I denoted the amount the CSDG will receive from that sale

with the variable X, and calculated the liability of Simon Wrecking and Simon Resources to be

9.38% x ($16,466,995 - X).  Therefore until the property is sold and the value of X becomes

known, the Simon Entitities' liability will be denoted by this formula.  Once X has a determinate

value, I will use the formula to calculate and enter the exact dollar amount of the judgment

against Simon Wrecking and Simon Resources.  An appropriate interlocutory order follows.

**INTERLOCUTORY ORDER**


**AND NOW**, this _24TH___ day of April 2006, following trial and consideration of the

evidence, it is **ORDERED** that Defendant Simon Wrecking, Inc., a transporter of waste to the

Chemclene site, and defendant Simon Resources, Inc., its corporate successor, are jointly and

severally liable to the plaintiffs for their share of the cleanup costs in the amount of

$$9.38\% \times (\$16{,}466{,}995 - X)$$

where X denotes the amount the plaintiffs will receive under their settlement with Chemclene.

It is further **ORDERED** that a hearing on the value of X shall be held in Courtroom 7A

on **Friday May 5, 2006** at **9:30 a.m.**  After the hearing, a final order will issue granting plaintiffs

judgment in an amount to be determined according to the formula above.


_____

ANITA B. BRODY, J.


Copies **VIA ECF** on _____  to:              Copies **MAILED** on _____  to:


O:\ABB 2006\Action Findings of Fact.wpd

84

## APPENDIX A: Trial Witness List

At trial, the following witnesses testified:

- **Lloyd Balderston**, former president of Chemclene. (1/10/06)
- **Linda Dietz**, supervisor of remedial project managers at EPA Region 3, and former project manager of the Site. (1/5/06)
- **George Dippell**, former Chemclene employee. (1/10/06)
- **Raymond Dovell**, CPA, forensic accountant with Nihill and Riedley, AtC., plaintiffs' expert allocation witness. (1/13/06, 1/17/06)
- **King Graver**, former Chemclene employee. (1/10/06)
- **Jeffrey Lupo**, former Chemclene employee. (1/9/06)
- **Leo Mullin**, cost recovery expert with EPA Region 3. (1/6/06, 1/12/06, 1/20/06)
- **David R. Perry**, AtG., president of American Geosciences, Inc., defendants' expert witness on cost estimates for Site remediation. (1/18/06)
- **Adrien Rieder**, former contracting officer at Letterkenney Army Depot in Chambersburg, PA. (1/17/06)
- **David Simon**, testifying on the relationship between the Simon Entities and the Simon Entities Trust. (1/12/06, 1/19/06)
- **Jeffrey A. Smith**, MS, a professional hydrogeologist with Langan Engineering and Environmental Services, and plaintiffs' expert witness on cost estimates for Site remediation.(1/5/06, 1/6/06, 1/20/06)
- **Mark A Stevens,** Esq., partner at Langsam, Stevens & Silver LLP, and Liason Counsel for the CSDG. (1/9/06, 1/12/06)
- **Christopher Wittenbrink**, president of CR Consulting, Inc., defendants' expert allocation witness. (1/17/06, 1/18/06)
- **Chris Young**, geologist and project coordinator for CSDG at de maximis, inc. (1/11/06)
- **Scott Zelov**, chair of the CSDG finance committee.  Zelov is also a consultant working with VIX Liquidation Trust (a member of the CSDG) and is on the Board of Commissioners of Lower Merion Townshiat (1/4/06)

**APPENDIX B: Glossary**

| | |
|---|---|
| 1,4 dioxane | a hazardous substance associated with industrial solvent sites, was commonly used in TCA as a stabilizer |
| bioremediation | degrading the chlorinated contaminatns into non-toxic end products through the use of bacteria |
| "capping" | construction of an engineered "cap" for the MPA soils, designed to reduce the infiltration of any surface water through to the ground water |
| de minimis PRPs | PRPs that contributed only a small amount of hazardous material to the Site, and that are eligible to settle their liability through payment to EPA |
| CERCLA | Comprehensive Environmental Response, Compensation and Liability Act 42 U.S.C. § 9601 et seq. |
| CSDG | Chemclene Site Defense Group, a group of PRPs that signed a Consent Decree with EPA in 1999 to remediate the site, and who are the plaintiffs in this action |
| CTR | Comprehensive Transaction Report, a database created by EPA of the dates and volumes of specific transactions of waste at the Site |
| DEP | Pennsylvania Department of Environmental Protection |
| EPA | federal Environmental Protection Agency |
| FDA | Former Disposal Area, the portion of the Site where Chemclene disposed of waste prior to 1968 |
| HSCA | Hazardous Sites Cleanup Act, 35 P.S. § 6020.101 et seq. |
| "internal paperwork" | record of the amount of reclaimed solvent produced by the still at Chemclene from a customer's waste solvent |
| Letterkenney | Letterkenney Army Depot in Chamber in Chambersberg, PA |
| M/C | waste methylene chloride, a chlorinated solvent and hazardous substance |
| MNA | Monitored Natural Attenuation, the ROD-selected remedy for the FDA groundwater at the Site |

MPA                          Main Plant Area, the portion of the Site where Chemclene operations took place

NCP                          National Contingency Plan

PDI                          Pre-Design Investigation of conditions at the Site, commissioned by the CSDG for submission to the EPA

PRP                          Potentially Responsible Party - party that may have liability for clean up at a Superfund Site

pump and treat               system for ground water collection, treatment and discharge; the ROD-selected remedy for the MPA groundwater at the Site

ROD                          EPA's Record of Decision at the Site, which details the remedy

Simon Entities               Simon Wrecking Co., Simon Resources Inc., and Mid-State Trading Co., Inc.

Site                         Malvern TCE Superfund Site in Malvern, Pennsylvania

SVE                          Soil Vapor Extraction, an in situ remedy in which wells in the soil extract vapors coming off the contaminants subsurface, now the ROD-specified remedy for the FDA soils at the Site

TCA or 1,1,1                 1,1,1 trichloroethane, a chlorinated solvent and hazardous substance

TCE, trico or tri            Trichloroethylene, a chlorinated solvent and hazardous substance

vapor intrusion              gas from contaminated soil or groundwater that can migrate to the surface and possibly enter homes through basements or foundations

VRS                          Volumetric Ranking Summary, an EPA-created document totaling up the volume of material attributed to specific parties related to the Site